56 F.3d 1259
 Harry ROBINSON and Kay Robinson; Eva May McCarthy; and
George Samuel Robinson, Plaintiffs-Appellants,
v.
AUDI AKTIENGESELLSCHAFT, f/k/a Audi NSU Auto Union
Aktiengesellschaft, a foreign corporation;
Volkswagen of America, Inc., Defendants-Appellees.
 No. 92-5238.
 United States Court of Appeals,
Tenth Circuit.
 May 30, 1995.
 
 1
 Winton D. Woods, Tucson, AZ (Ronald D. Mercaldo and Lucile D. Sherman of the Law Offices of Ronald D. Mercaldo, Ltd., Tucson, AZ., Thomas Elke, Palo Alto, CA, and Maynard I. Ungerman, Ungerman & Iola, Tulsa, OK, with him on the briefs), for plaintiffs-appellants.
 
 
 2
 Richard M. Eldridge, Rhodes, Hieronymus, Jones, Tucker & Gable, Tulsa, OK (John H. Tucker, Rhodes, Hieronymus, Jones, Tucker & Gable, Tulsa, OK, and Herbert Rubin and Daniel V. Gsovski, Herzfeld & Rubin, P.C., New York City, with him on the brief), for defendants-appellees.
 
 
 3
 Before EBEL and KELLY, Circuit Judges, and BROWN, District Judge.*
 
 
 4
 WESLEY E. BROWN, Senior District Judge.
 
 
 5
 This is an appeal from an order denying plaintiff's request to set aside a judgment. The judgment in question resulted from a jury verdict in defendants' favor on plaintiffs' product liability claims. After that judgment was affirmed on appeal, plaintiffs filed a complaint in the district court alleging that the defendants had obtained the judgment by means of a fraud upon the court. Pursuant to Fed.R.Civ.P. 60(b), the district court held a bench trial on the allegations and, after hearing the evidence, concluded that plaintiffs had failed to prove such fraud. Plaintiffs now contend that the district court's ruling was flawed. We exercise jurisdiction under 28 U.S.C. Sec. 1291 and, for the reasons set forth herein, we affirm.[1]
 
 
 6
 I. History of the Litigation.
 
 
 7
 An understanding of the plaintiffs' allegation of fraud on the court requires a review of the eighteen-year history of this litigation. The plaintiffs were injured in an automobile accident on an Oklahoma highway in 1977. The car in which they were traveling, a 1976 Audi 100 LS, was struck from behind by a Ford Torino being operated by a drunk driver. The Ford was going approximately 90 miles per hour at the time of the crash, while the plaintiffs' car was going an estimated 55 miles per hour. The impact of the collision crushed the rear end of the Audi up to twenty-four inches, and the doors of the car were jammed shut. The impact also punctured the Audi's fuel tank, called a "drop-in" type, which was located in the back of the car and which served as the floor of the trunk. The Audi burst into flames from the collision, and the plaintiffs were severely burned.
 
 
 8
 Plaintiffs brought an action in the District Court for Creek County, Oklahoma, claiming that their injuries resulted from defective design and placement of the Audi's gas tank and fuel system. The initial named defendants included the vehicle's importer, Volkswagen of America, Inc., as well as the regional distributor and the retailer of the car. An amended petition named Volkswagenwerk Aktiengesellschaft (hereinafter "Volkswagen AG"), a German company, as the manufacturer of the vehicle. Plaintiffs subsequently substituted Audi NSU Auto Union Aktiengesellschaft (hereinafter "Audi" or "Audi NSU"), a subsidiary of Volkswagen AG, for Volkswagen AG, stating that through interrogatories they had learned that Audi was the manufacturer of the vehicle. Aple.Supp.App. at 804. It is undisputed that this substitution was made after a lawyer for one of the defendants informed plaintiffs' counsel that Audi NSU rather than Volkswagen AG was the manufacturer. A jurisdictional dispute was eventually decided by the United States Supreme Court, which held that personal jurisdiction was lacking over the regional distributor and the retailer, see World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), and those defendants were dismissed from the case. The remaining defendants, Audi NSU and Volkswagen of America, removed the action to the U.S. District Court for the Northern District of Oklahoma, where the claims were tried to a jury.
 
 
 9
 In the course of the jury trial, plaintiffs attempted to admit into evidence certain documents that Volkswagen of America had submitted to the National Highway Traffic Safety Administration (NHTSA) on behalf of Volkswagen AG between 1967 and 1974. The documents indicated that Volkswagen of America and Volkswagen AG were aware at the time the submissions were made that a car with a fuel system of the type later used in the 1976 Audi LS 100 carried a risk of combustion when impacted from behind. The defendants challenged the admissibility of this evidence, and the district court heard extensive arguments on the issue. Counsel for Audi argued, among other things, that the submissions were made on behalf of Volkswagen AG and were therefore irrelevant to the claims against Audi. In a memorandum in support of Audi's motion in limine, counsel argued that the fact that both of the defendants were subsidiaries of Volkswagen AG was irrelevant, stating that Volkswagen AG "had nothing whatever to do with the design, manufacture or sale of the subject Audi 100 LS." See Aplt.App. at 696. Counsel also argued that, although there was an agency relationship between Audi and Volkswagen of America, the submissions in question did not arise from that relationship and the documents were therefore not admissible against either Audi or Volkswagen of America.
 
 
 10
 The district court excluded the evidence, finding that Volkswagen of America's knowledge had not been acquired by virtue of its agency relationship with Audi and, thus, the documents could not be attributed to Audi. Aple.Supp.App. at 435. The court also held that such knowledge was not admissible against Volkswagen of America because the distributor's knowledge of the state of the art could not be attributed to the manufacturer in a case involving an alleged design defect. Id. at 435-36. The jury later returned a verdict for the defendants.
 
 
 11
 Plaintiffs appealed the judgment. See Robinson v. Audi NSU Auto Union, 739 F.2d 1481 (10th Cir.1984). This court upheld the judgment in favor of Audi NSU but reversed the judgment in favor of Volkswagen of America. As to Audi, we noted that the NHTSA submissions that the trial court excluded were made on behalf of Volkswagen AG rather than Audi and that there was no agency relationship between Audi and Volkswagen of America concerning such submissions at the time the submissions were made (although such a relationship was later made). Id. at 1487. Thus, we concluded that the knowledge contained in the documents could not be attributed to Audi. As to Volkswagen of America, however, we concluded that the documents were admissions against interest which showed that Volkswagen of America had prior knowledge of the alleged defect. We further concluded that such knowledge was relevant to whether the product was unreasonably dangerous and found that under Oklahoma law it was inconsequential that Volkswagen of America did not design or manufacture the allegedly defective vehicle. Id. at 1487-88. We therefore ordered a new trial on the claims against Volkswagen of America and sent the case back to the district court. Before a new trial could be held, however, the Oklahoma Supreme Court ruled that a verdict in favor of an automobile manufacturer in a strict liability action absolves a retail dealer of liability where the alleged defect is attributable solely to the manufacturing process rather than to any conduct by the distributor. See Braden v. Hendricks, 695 P.2d 1343 (Okla.1985). Relying on Braden, the district court then granted summary judgment in favor of Volkswagen of America. Plaintiffs again appealed, and this time we upheld the judgment. See Robinson v. Volkswagen of America, Inc., 803 F.2d 572 (10th Cir.1986). In doing so we rejected plaintiffs' argument that evidence of prior knowledge by Volkswagen of America took the case outside of the Braden rule. We noted that the jury's determination in favor of Audi established that the placement of the gas tank did not render the Audi 100 LS a defective product, "and this issue cannot be relitigated." Id. at 575. Moreover, because there was no allegation that conduct in the distribution process led to any defect, we found that judgment in favor of Volkswagen of America was proper under Braden. Id.
 
 
 12
 II. Plaintiffs' Action for Relief From the Judgment.
 
 
 13
 In 1989, the plaintiffs filed the complaint that forms the basis of this action. Jurisdiction was alleged under the court's "inherent and continuing jurisdiction over its judgments." Aplt.App. at 3. The complaint alleged that during the trial the defendants had intentionally or recklessly misrepresented and failed to disclose a close corporate relationship between Volkswagen AG and Audi NSU (including Audi NSU's predecessor Auto Union GmbH).[2] The allegations focused on statements made to the court by Myron Shapiro, Audi NSU's attorney, concerning the admissibility of the Volkswagen AG NHTSA submissions. Plaintiffs pointed out that Mr. Shapiro argued that the Volkswagen AG submissions were irrelevant to the claims against Audi NSU and that he made certain statements in support of that argument, including an assertion that Volkswagen AG had nothing to do with the design, manufacture or sale of the subject Audi 100 LS. Aplt.App. at 20 (Complaint p 46-51). Plaintiffs alleged that these statements were either false or misleading in light of the actual relationship between these companies, which plaintiffs maintained was one of "near alter ego." Id. at 9. According to plaintiffs, the misrepresentations were part of a scheme to deceive the court and were designed to conceal the relationship between Volkswagen AG and Auto Union or Audi NSU and thereby prevent any admissions of Volkswagen AG from being introduced into evidence against Audi at the previous trial. Aplt.App. at 152. The complaint alleged that as part of this scheme Audi NSU, acting through its attorney Mr. Shapiro, knowingly gave false answers to plaintiffs' interrogatories concerning the corporate history of Audi NSU and its relationship with Volkswagen AG. Aplt.App. at 27-28. The complaint requested, among other things, that the judgment be set aside.
 
 
 14
 In April of 1990, the district court found that the allegations in the complaint were sufficient to withstand a motion to dismiss under Fed.R.Civ.P. 12(b)(6). From June 1 to June 15, 1992, the district court conducted a bench trial on the allegations in the complaint. Plaintiffs conceded from the outset that employees of Auto Union GmbH, Audi NSU's predecessor, had designed the fuel system used in the Audi 100 LS and that the particular automobile purchased by the plaintiffs was manufactured by employees of Audi NSU rather than Volkswagen AG. Aple.Supp.App. at 114-15. Plaintiffs alleged, however, that during this period Volkswagen AG owned, controlled and dominated Auto Union and its successor Audi NSU.[3] At the hearing, plaintiffs presented evidence concerning the interrogatory answers by Audi in the underlying suit. Plaintiffs argued that these answers showed that Mr. Shapiro had covered up the relationship between Volkswagen AG and Audi NSU. Plaintiffs also presented evidence tending to show that Volkswagen AG had a previously undisclosed right of control over Auto Union and Audi NSU, including evidence of written agreements--one between Volkswagen AG and Auto Union GmbH and the other between Volkswagen AG and Audi NSU--which gave Volkswagen AG the right to issue directives to the managing boards of these subsidiaries. See Aple.Supp.App. at 617, 626. These agreements also provided that the profits or losses of these subsidiaries would be passed on to Volkswagen AG, and the annual reports of Volkswagen AG showed that this was in fact done. Plaintiffs also presented evidence of a meeting that was held in 1966 during which members of the Auto Union technical department disclosed to the Board of Management of VWAG the development of the Audi 100. Testimony was presented indicating that as a result of this meeting the VWAG Board of Management provided Auto Union the funds for the development and manufacture of the Audi 100 series. Additionally, plaintiffs presented evidence showing that Audi and Volkswagen automobiles were produced at the same facility in West Germany between 1965 and 1969.
 
 
 15
 The defendants countered with their own evidence at the hearing, including the testimony of Audi's attorney, Mr. Shapiro. Mr. Shapiro denied that he had intentionally given false answers or had concealed facts in answering plaintiffs' interrogatories. He explained how he had obtained information from his client and how he had formulated the answers given in the interrogatories. He indicated that some information regarding the ownership history of Auto Union had been inadvertently left out of interrogatory answers. Aple.Supp.App. 492. He testified that, contrary to the plaintiffs' theory that he had schemed from the beginning to keep Volkswagen AG's NHTSA submissions out of evidence, he was unaware of the specific NHTSA submissions in question until they were disclosed by the plaintiffs at the trial. He testified (as he had told the judge during the products liability trial) that prior to trial he had checked to see if Audi had made any submissions to the NHTSA concerning fuel system integrity but did not pursue indications that Volkswagen AG made such submissions because he believed any submissions by Volkswagen AG would be irrelevant to the claims against Audi NSU. Aple.Supp.App. at 207. Without going into unnecessary detail, we simply note that Mr. Shapiro's testimony provided a basis upon which the district court could conclude that the interrogatory answers were made by Mr. Shapiro without any intent to deceive or defraud.
 
 
 16
 As to Mr. Shapiro's arguments to the court concerning the NHTSA submissions, Mr. Shapiro testified at the hearing that, to the best of his knowledge, he did not misrepresent any facts to the judge. His testimony suggested that his representations were based on his belief that Volkswagen AG and Audi NSU, although they were parent and subsidiary, were legally separate entities. Mr. Shapiro testified that he had been unaware of the aforementioned contracts between Volkswagen AG and Audi NSU (and Auto Union) at the time he made his representations to the court. He conceded that prior to trial he had made no investigation of whether such contracts existed. Aplt.App. at 366, 369-70. He indicated that when he made his representations to the court, he did so based upon a belief that his prior representation of these companies had given him good knowledge of the relationship between them. Aplt.App. at 350.
 
 
 17
 By way of deposition, L.A.M. Dekkers, who had been the managing director of Auto Union GmbH from 1964 to 1969, testified that Volkswagen AG knew nothing about the initial stages of the Audi 100 LS, indicating that the car had been independently developed by Auto Union's technical department. Aplt.App. at 163. Dekkers stated that Auto Union operated independently and that Volkswagen AG played no role in the design of the Audi 100 LS. Id. at 259. Professor Buxbaum, an expert on German law called by the defendants, characterized the profit and loss transfer agreements referred to above as standard agreements under German law that allow parent and subsidiary corporations to obtain consolidated tax and reporting treatment. Aple.Supp.App. at 217. He indicated that some of the terms in the agreement, including those referring to the "integration" of Auto Union into Volkswagen AG, were required by German statute in order to obtain consolidated tax treatment. He further indicated that under the agreement Volkswagen AG had the right to issue directives to Auto Union, which gave the former a right of control; but that, in the absence of a specific directive, the subsidiary was required to operate independently. Heinrich Ulmer, head of the legal department at Audi NSU, testified that Volkswagen AG issued no directives to Audi concerning the design or manufacture of the Audi 100 LS. Aple.Supp.App. at 296.
 
 
 18
 District Court Ruling. After hearing the evidence and the arguments relating to the alleged fraud and after reviewing the parties' proposed findings of fact and conclusions of law, the district court issued a memorandum and order finding in favor of the defendants. In that memorandum the court summarized the plaintiffs' allegations of fraud, including plaintiffs' assertion that Audi's counsel led a concerted effort to conceal the corporate relationship between Volkswagen AG and Audi NSU or, in the alternative, that he was "less than honest about his knowledge of that relationship." "In sum," the court noted, "Plaintiffs argue that the evidence adduced establishes a scheme to suppress information vital to its case as it pertains to the corporate relationships and, therefore, imputed knowledge of Audi NSU vis a vis the allegedly defective design of the gas tank and fuel system of the Audi 100 LS." After stating that he would have admitted the NHTSA submissions at trial had he known all of the facts now before him, the judge nevertheless held that the evidence failed to support the allegations of fraud:
 
 
 19
 The Court has reviewed the record and, most particularly, the evidence presented by Plaintiffs/Movants herein. Indeed, the Court was compelled to study in some depth the effective and exhaustive case prepared by Plaintiffs' counsel to ascertain its proper interface with the relevant law. As a preliminary matter, the Court must concede that had it been appraised of the material contained in Plaintiffs' Proposed Findings of Fact and Conclusions of Law (FF/CL) filed July 27, 1992 at pp. 38-42 (nos. 53-55) the submissions exhibits at issue would most assuredly have been admitted into evidence. Indeed, it seems fair to say that if the relevant corporate relationships set forth in Plaintiffs' FF/CL, cited above had been on record, VWAG would have been joined as a defendant. And the Court so finds. However, nowhere in this meticulously prepared and effectively argued claim does there appear clear and convincing evidence that Defendants' counsel was involved in a "deliberately planned and carefully executed scheme" to defraud this Court through misrepresentation and nondisclosure. In the absence of such evidence, the Court is bound by the relevant case law to deny Plaintiffs' Motion. This case is, accordingly, dismissed.
 
 
 20
 Aplt.App. at 173.
 
 
 21
 III. Issue on Appeal.
 
 
 22
 The sole point of error alleged by the plaintiffs is that the trial court applied an incorrect legal standard for fraud on the court. Aplt.Br. at ii. Focusing on the court's finding that there was no evidence of a "deliberately planned and carefully executed scheme" and the comment that "in the absence of such evidence, the Court is bound by the relevant case law to deny Plaintiffs' Motion," plaintiffs contend that the district court applied an unduly narrow definition of fraud on the court. Plaintiffs point out that the "deliberately planned" language used by the district court was taken from Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944), a leading Supreme Court case; and they argue that the trial court mistakenly substituted the factual basis of the fraud found in Hazel-Atlas for the broader standard of fraud generally: "We submit that the trial court's conversion of that clearly sufficient factual predicate into the necessary legal standard for all cases is erroneous as a matter of law." Aplt.Br. at 30 (emphasis in original). Although plaintiffs are not entirely clear on this point, we gather it is their contention that the district court erred by failing to recognize that statements made with reckless disregard for the truth, in addition to "deliberate" misrepresentations, can form the basis of fraud on the court.
 
 
 23
 Plaintiffs emphasize that their challenge is solely to the legal standard applied by the court; for purposes of appeal, they accept the district court's factual finding that there was no deliberate scheme to defraud the court on the part of defendants' counsel. Aplt.Rep.Br. at 5. Moreover, inasmuch as the only issue is whether the trial court properly applied the doctrine of "fraud on the court," no issue is raised as to whether the facts are sufficient to permit relief on some other grounds, such as mistake or newly discovered evidence. Cf. Fed.R.Civ.P. 60(b).
 
 
 24
 IV. Discussion.
 
 
 25
 In order to address plaintiffs' claim, we first review the nature of "fraud on the court" as it has been recognized by the courts. We then proceed to address whether the district court's ruling is consistent with that standard.
 
 
 26
 Any request to set aside a judgment must be viewed in light of a fundamental principle of the finality of duly entered judgments: namely, where a reasonable opportunity has been afforded to the parties to litigate a claim before a court having jurisdiction, and the court has finally decided the controversy, the interests of the public and of the parties require that the validity of the claim and any issue actually litigated in the action shall not be litigated again by them.[4] Restatement of Judgments (First) Sec. 1 (1942). See United States v. Throckmorton, 98 U.S. (8 Otto) 61, 65-66, 25 L.Ed. 93 (1944). One long-recognized exception to the general rule of finality is where a judgment was based on a claim that the party obtaining the judgment knew it to be fraudulent. See Restatement of Judgments (Second) Sec. 70 (1982). Historically, this exception was said to apply, however, only when the fraud was so successful that the other party was not even aware that he had a possibility of a claim or defense.[5] Restatement of Judgments (First) Sec. 118, Comment a. By contrast, relief was not available--even in the case of an erroneous and inequitable judgment--on the sole ground that the judgment was obtained by perjured testimony or that the complainant failed to maintain his action because of a non-fraudulent misrepresentation as to the facts by the other party. Id. at Sec. 126.
 
 
 27
 In Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944), the Supreme Court recognized what is now referred to as the "fraud on the court" doctrine. In that case, attorneys and agents of respondent Hartford, in order help Hartford obtain a patent, had prepared and submitted a spurious trade journal article to the U.S. Patent Office. Hartford's application for the patent was granted, and Hartford later brought suit against petitioner Hazel-Atlas alleging infringement of the patent. A lower court found no infringement. The case was then appealed to the circuit court. In the course of the appeal, one of the attorneys who had played a part in getting the spurious article published referred the circuit court to the article. Relying in part upon the article, the circuit court concluded that the patent was valid and reversed the judgment. Hazel-Atlas then brought an action in the circuit court setting forth the circumstances surrounding the use of the spurious article and requesting relief from the judgment. The circuit court refused to grant relief, however, citing among other things a lack of diligence on Hartford's part and a belief that the court had no power to set aside a judgment after the end of the term of court at which the judgment was entered.
 
 
 28
 On appeal from that ruling the Supreme Court held that federal courts have inherent equitable power to grant relief in cases of after-discovered fraud regardless of the "end of the term rule," and concluded that "every element of the fraud here disclosed demands the exercise of the historic power of equity to set aside fraudulently begotten judgments." The Court noted that this was not simply a case of a judgment obtained with the aid of a witness who is believed possibly to have been guilty of perjury, but was "a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals." Id. at 245, 64 S.Ct. at 1001. The Court rejected suggestions that a lack of diligence by the aggrieved party could justify denial of relief, finding that tampering with the administration of justice in the manner shown here involved more than an injury to a single litigant and that the court's power to preserve the integrity of the judicial process did not depend on the diligence of the litigants. Id. at 246, 64 S.Ct. at 1001.
 
 
 29
 In Bulloch v. United States, 763 F.2d 1115 (10th Cir.1985) (en banc), this court summarized the nature of "fraud on the court" in light of Hazel-Atlas and other cases:
 
 
 30
 Fraud on the court ... is fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury. It has been held that allegations of nondisclosure in pretrial discovery will not support an action for fraud on the court ... It is thus fraud where the court or a member is corrupted or influenced or influence is attempted or where the judge has not performed his judicial function--thus where the impartial functions of the court have been directly corrupted.
 
 
 31
 Id. at 1118. See Aplt.App. at 170 (Passage cited in District Court's Memorandum and Order of 9/17/92 at 7).
 
 
 32
 As we noted previously, plaintiffs' assertion of error appears to be based on the view that the district court misunderstood the element of scienter required for fraud on the court. Few courts have addressed what, if any, specific mental state must be shown in order to characterize a false representation to the court as a "fraud upon the court" sufficient to set aside a judgment. As plaintiffs point out, the Sixth Circuit recently held that "a scheme based on a subjective intent to commit fraud" is not required because "reckless disregard for the truth is sufficient." Demjanjuk v. Petrovsky, 10 F.3d 338, 353 (6th Cir.1993), cert. denied, --- U.S. ----, 115 S.Ct. 295, 130 L.Ed.2d 205 (1994). Other courts seem to have taken a more restrictive view, stating that a fraud on the court occurs "where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." See Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118 (1st Cir.1989). See also Rozier v. Ford Motor Co., 573 F.2d 1332, 1338 (5th Cir.1978) (quoting England v. Doyle, 281 F.2d 304, 310 (9th Cir.1960) ("[I]t is necessary to show an unconscionable plan or scheme which is designed to improperly influence the court in its decision.") Cf. In Re Laing, 945 F.2d 354, 357-58 (10th Cir.1991).
 
 
 33
 We think it clear that "fraud on the court," whatever else it embodies, requires a showing that one has acted with an intent to deceive or defraud the court. A proper balance between the interests underlying finality on the one hand and allowing relief due to inequitable conduct on the other makes it essential that there be a showing of conscious wrongdoing--what can properly be characterized as a deliberate scheme to defraud--before relief from a final judgment is appropriate under the Hazel-Atlas standard. Thus, when there is no intent to deceive, the fact that misrepresentations were made to a court is not of itself a sufficient basis for setting aside a judgment under the guise of "fraud on the court." Cf. Restatement of Judgments (First) Sec. 126 (Equitable relief will not be granted on the sole ground that the complainant failed to maintain his action because of a nonfraudulent misrepresentation as to the facts by the other party.)
 
 
 34
 Having found that a "fraud on the court" requires an intent to deceive or defraud the court, we now turn to plaintiffs' claim that the district court applied an improper standard. Our review of the entire record convinces us that the district court applied a standard consistent with the foregoing discussion of fraud on the court and that its refusal to grant relief was not an abuse of discretion. The district court, in over five pages of discussion devoted to the issue, discussed and set forth the holdings of the Supreme Court in Hazel-Atlas and of this court in Bulloch. The court further noted, as plaintiffs had argued, that attorney misconduct directed at the court can constitute a "fraud on the court":
 
 
 35
 While it is incumbent upon an attorney to "represent his client with singular loyalty, that loyalty obviously does not demand that he act dishonestly or fraudulently; on the contrary his loyalty to the court, as an officer thereof, demands integrity and honest dealing with the court.
 
 
 36
 Memorandum and Order at 8 (citing 7 Moore, Federal Practice p 60.33 at 513 (1971 ed.) The court quite clearly--and properly--recognized that a violation of the duty of honesty is essential to a claim of fraud on the court.
 
 
 37
 Against this backdrop the district court found no evidence that defendants' counsel was involved in a " 'deliberately planned and carefully executed scheme' to defraud this Court through misrepresentation and nondisclosure." We see nothing improper in the district court's dismissal of the complaint upon making this finding. As our previous discussion indicates, fraud on the court requires an intent to deceive or defraud the court. The district court found as a factual matter that no such intent had been shown.[6] Although plaintiffs now maintain that the trial court's opinion shows that it misunderstood that scope of fraud on the court, in fact the court's dispositive finding was directly responsive to the claim asserted by plaintiffs. See Aplt.App. at 152 (Pretrial Order, Plaintiffs' Contentions, App. E, p 3).
 
 
 38
 The district court's determination on the question of intent is a factual finding. As a reviewing court, we may not set aside that finding unless it is "clearly erroneous." Fed.R.Civ.P. 52(a). Where, as here, a factual determination rests upon the credibility of a witness, Rule 52(a) demands even greater deference to the findings of the trial judge. Anderson v. City of Bessemer, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Although plaintiffs deny that they are challenging the district court's factual determination, much of their briefs is devoted to arguing that the evidence shows that Audi's attorney acted with an intent to deceive. We have reviewed the record and are satisfied that the district court's finding is not clearly erroneous. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson, supra. The district court's finding in this case, although not the only possible view, has substantial support in the record and is a permissible view in light of all the evidence.
 
 
 39
 Conclusion.
 
 
 40
 The judgment of the district court is AFFIRMED.
 
 
 
 *
 The Honorable Wesley E. Brown, Senior District Judge, United States District Court for the District of Kansas, sitting by designation
 
 
 [1]
 This appeal is closely related to the separately filed appeal in Robinson v. Volkswagenwerk AG, 56 F.3d 1268 (10th Cir.1995)
 
 
 [2]
 We note the apparently undisputed evidence indicating that during the products liability trial the plaintiffs were aware that Audi NSU was a subsidiary of Volkswagen AG, see Aple.Supp.App. at 155, and that based on interrogatory answers plaintiffs' counsel believed at that time that Audi NSU, Volkswagen AG, and Volkswagen of America were "one big happy family." Id. The parties clearly disagree over whether the plaintiffs could have avoided the effects of the alleged fraud by exercising greater diligence in investigating the corporate relationships. Be that as it may, the district court made no findings in this regard. Moreover, in Hazel-Atlas the Supreme Court indicated that the question of whether the aggrieved party exercised due diligence was not necessarily dispositive in the context of fraud on the court. See Hazel-Atlas, 322 U.S. at 246, 64 S.Ct. at 1001 ("Surely it cannot be that the preservation of the integrity of the judicial process must always wait upon the diligence of the litigants.")
 
 
 [3]
 This "alter ego" theory was set forth in the complaint. Aplt.App. at 9. In arguments to the court, however, the plaintiffs appeared to assert instead that Volkswagen AG and Auto Union had divided up the tasks necessary for the production of the 100 LS such that they should be considered "joint venturers." Aple.Supp.App. at 117
 
 
 [4]
 Historically, this principle was said to apply even though the party against whom the judgment was entered is later in a position to produce better evidence so that he would be successful in a second action, and even though the judgment may have been based on an erroneous view of the law or the facts. Restatement of Judgments (First) Sec. 1, Comment b (1942). The procedures available to the parties in the district court and in an appellate court in the original action were deemed sufficient to protect against erroneous judgments, and if such procedures did not result in reversal of the judgment, a party was generally not entitled to another opportunity to present his claim. Id
 
 
 [5]
 Cf. United States v. Throckmorton, supra
 
 
 [6]
 It is clear that the district court's ruling was based upon a lack of any intent to defraud the court. We would also point out, however, that notwithstanding the court's "finding" that had it known the corporate relationships it would have admitted the NHTSA submissions and Volkswagen AG would have been made a party, the district court made no finding that the representations made by Audi's attorney were false. Although plaintiffs argue that the relationship between the companies shows that the statement that Volkswagen AG "had nothing whatever to do with" the design or manufacture of the Audi 100 LS is "just not true," such a representation can be reasonably viewed as a true statement of the legal relationship between these companies. Mr. Shapiro's comments could clearly be considered a good faith legal argument. The question of whether an allegedly dominant corporation may be held liable for a subservient entity's tort depends on many factors. Frazier v. Bryan Memorial Hosp. Authority, 775 P.2d 281, 288 (Okla.1989). There is conflicting evidence in this record concerning the factors relevant to whether the separate corporate identities of Volkswagen AG and Audi (or its predecessor) could have been disregarded. Cf. id