# UNITED STATES COURT OF APPEALS
## Tenth Circuit
### Byron White United States Courthouse
### 1823 Stout Street
### Denver, Colorado 80294
### (303) 844-3157

Patrick J. Fisher, Jr.
Clerk

Elisabeth A. Shumaker
Chief Deputy Clerk

October 23, 1996

**TO:** ALL RECIPIENTS OF THE CAPTIONED OPINION

**RE:** 95-3046, 95-3065, 95-3230, Weese v. Schukman
October 15, 1996 by The Honorable David M. Ebel

Please be advised of the following correction to the captioned decision:

Mr. Schukman's name, appearing on page 5, first full paragraph, line 2, is misspelled. The correct spelling is Schukman.

Please make the appropriate correction to you copy.

Very truly yours,

Patrick Fisher, Clerk

Trish Lane
Deputy Clerk

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**Filed 10/15/96**

**TENTH CIRCUIT**

CALVIN L. WEESE, JR.,

       Plaintiff-Appellee,

v.

JAY S. SCHUKMAN, M.D.,

       Defendant-Appellant,

_____

STATE OF KANSAS, for and on behalf
of the Health Care Stabilization Fund, an
agency of the State,

       Intervenor.

No. 95-3046
No. 95-3065

CALVIN L. WEESE, JR.,

       Plaintiff-Appellant,

v.

JAY S. SCHUKMAN, M.D.,

       Defendant-Appellee.

No. 95-3230

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 91-CV-1481)**

Michael R. O'Neal, of Gilliland & Hayes, Hutchinson, Kansas (Matthew L. Bretz, of Gilliland & Hayes, Hutchinson, Kansas, with him on the briefs), for Jay S. Schukman, M.D.

Randall E. Fisher, Wichita, KS, for Calvin L. Weese, Jr.

Steven C. Day, of Woodward, Blaylock, Hernandez, Roth & Day, Wichita, Kansas, for Intervenor State of Kansas.

---

Before **PORFILIO, BRORBY** and **EBEL**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

In this medical malpractice litigation, the defendant appeals entry of a post-verdict judgment as a matter of law ("JML") in favor of the plaintiff. Plaintiff cross-appeals, claiming that the district court should have granted a new trial and challenging the constitutionality of a state statute requiring certain medical malpractice awards to be paid in installments. Plaintiff also claims that the district court should have found that the defendant committed fraud on the court. In response, the defendant asks for sanctions on the grounds that plaintiff's fraud on the court appeal is frivolous.

Having carefully considered each argument raised by each party, we affirm in part and reverse in part. Concerning defendant's appeal of the JML motion granted against him, we agree with defendant that the jury verdict should stand and therefore we REVERSE the JML judgment below and REINSTATE the jury verdict in favor of defendant. We AFFIRM the decision of the district court denying plaintiff a new trial.

- 2 -

Because we reinstate the jury verdict in favor of defendant, effectively abrogating plaintiff's damage award, we need not address the constitutionality of the state's medical malpractice award periodic payment statute. We also AFFIRM the district court's rejection of plaintiff's fraud on the court claim. Finally, we deny defendant's request for sanctions stemming from plaintiff's appeal of the fraud on the court claim.

**Background**

During an off-road four-wheeling trip in a Kansas river on November 24, 1989, Plaintiff Calvin Weese's Jeep became stuck with its tailpipe submerged in the water. Other members of Weese's party discovered Weese and his two nephews unconscious from carbon monoxide (CO) poisoning in the Jeep approximately ten to fifteen minutes later. It took about one-half hour from the time Weese was removed from the Jeep before the emergency medical service (EMS) was contacted by CB radio. It took an additional twenty minutes to carry Weese from the river bank to the location where the ambulance picked him up.

The EMS arrived at 22:01 and left the scene at 22:19. Weese arrived at the Central Kansas Medical Center ("CKMC") emergency room in Great Bend, Kansas, at 22:22, and was admitted to the emergency room at 22:35. Upon admission to the emergency room, Dr. William Von Ruden assessed Weese and ordered 100 percent oxygen, which was

administered with a non-rebreather oxygen mask held in place by elastic and, when needed, by nurses physically holding the oxygen mask on Weese to ensure a tight seal.

Weese was admitted to the CKMC telemetry floor at 00:30 on November 25 under the care of Defendant Dr. Jay Schukman. Dr. Schukman ordered that the 100 percent oxygen treatment be continued. He then went to the CKMC medical library to verify that the treatment by 100 percent oxygen was the appropriate treatment for CO poisoning. There, he consulted several textbooks, including Harrison's Principle's of Internal Medicine (11th ed. 1987), a standard internal medicine textbook. Harrison's provided that in the case of CO poisoning, "[p]ure oxygen should be administered" and "hyperbaric oxygen is helpful in seriously poisoned patients." After consulting Harrison's, Dr. Schukman did not modify his decision to administer 100 percent oxygen therapy. At 3:50, oxygen was decreased to 40 percent by mask. At 8:00 the non-rebreather mask was removed and Weese was given a venturi mask at 40 percent flow. At 8:40, the venturi mask was changed to 60 percent flow rate.

On December 1, 1989, Weese was transferred from CKMC to Stormont-Vail Hospital in Topeka at the request of his wife so that he could be closer to his home. On December 3, Dr. Hollis at Wesley Medical Center in Wichita contacted Weese's treating physician at Stormont-Vail, Dr. Fitzgerald, and suggested that hyperbaric oxygen treatment might potentially benefit Weese. Weese then was transferred to Wesley, where he was given hyperbaric oxygen treatment. Weese was discharged from Wesley and

admitted to Meadowbrook Hospital in Gardner, Kansas, in February 1990, where he received physical, occupational, speech, language, recreational, music, and vocational therapy. He was discharged from Meadowbrook on September 28, 1990, to return to his home and family.

Weese later brought this medical malpractice action against Dr. Schukman, alleging that he sustained neuropsychological injuries as a result of Dr. Schukman's negligent treatment. Specifically, Weese contended that Dr. Schukman breached the standard of care by failing to transfer him to Wesley Hospital for hyperbaric oxygen treatment when he was first moved to the CKMC telemetry floor. At trial, Dr. Schukman conceded that one way to meet the standard of care for CO poisoning is to provide hyperbaric oxygen treatment, which he did not do. However, Dr. Schukman and other witnesses also testified that the standard of care can be met when a doctor provides 100 percent oxygen to treat CO poisoning. The jury returned a verdict for Dr. Schukman, answering "no" to the following question: "Do you find defendant, Jay S. Schukman, M.D., was negligent in his treatment of plaintiff Calvin Weese and that his negligence caused Calvin Weese's injuries and damages?" Thereafter, the district court granted Weese's Fed. R. Civ. Pro. 50 motion for judgment as a matter of law notwithstanding the verdict. In granting the motion, the court concluded that: (1) Dr. Schukman did not meet the standard of care because he did not provide hyperbaric oxygen treatment and he did not prove that the alternative of 100 percent oxygen actually was delivered to Weese; and

(2) Dr. Schukman's breach of the standard of care caused Weese's injuries because if Dr. Schukman had transferred Weese to Wesley Hospital for hyperbaric treatment within six hours of the accident, the evidence established that Weese likely would have recovered fully. The court then ordered a new trial on the sole issue of damages. The court later denied: (1) Dr. Schukman's motion for reconsideration; (2) Weese's motion for a new trial; and (3) Dr. Schukman's motion to certify for interlocutory appeal. Dr. Schukman now appeals the district court's granting of Weese's JML motion and Weese appeals the district court's refusal to grant a new trial.

Following the district court's granting of Weese's JML motion, but prior to the second trial on damages, Weese's attorneys discovered certain information which Dr. Schukman did not reveal in his pre-trial or trial testimony. Weese then moved for sanctions against Dr. Schukman on the ground that Dr. Schukman committed fraud on the court. In response, Dr. Schukman sought Rule 11 sanctions against Weese. The court denied both requests. Weese now appeals the denial of his motion for sanctions based on his claim of fraud on the court. Furthermore, Dr. Schukman requests that we grant him damages and costs incurred in defending against Weese's appeal of his fraud on the court claim on the grounds that the appeal is frivolous.

**Dr. Schukman's Appeal of the Court Order Granting JML**

Dr. Schukman's appeal alleges that the district court erred in granting Weese's JML motion. In accordance with Fed. R. Civ. P. 50, we review a judgment as a matter of law under the same standard regardless whether the judgment is rendered before or after the jury renders its verdict, i.e., regardless whether the judgment would have been characterized as a "directed verdict" or a "JNOV" prior to the 1991 amendments to the federal rules. See FDIC v. United Pac. Ins. Co., 20 F.3d 1070, 1079 (10th Cir. 1994). The standard of review of the district court's decision regarding these motions is de novo. Id. Accordingly, we apply the same standard applied by the district court. Orth v. Emerson Elec. Co., White-Rodgers Div., 980 F.2d 632, 635 (10th Cir. 1992). Under this standard, we can uphold a JML order "only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party for whom the jury found; we must construe the evidence and inferences most favorably to the nonmoving party." Ralston Dev. Corp. v. United States, 937 F.2d 510, 512 (10th Cir. 1991). A motion for a judgment as a matter of law is cautiously and sparingly granted and then only when the court is certain the evidence "conclusively favors one party such that reasonable men could not arrive at a contrary verdict." Western Plains Service Corp. v. Ponderosa Development Corp., 769 F.2d 654, 656 (10th Cir. 1985).

The standard is particularly strict when such a ruling is made in favor of the party with the burden of proof.

> When the party with the burden of proof moves for a directed verdict the evidence must be viewed from a different perspective. Rather than

considering the evidence for its sufficiency to support a finding for the opposing party as is done when the party not having the burden of proof has made such a motion, the evidence is tested for its overwhelming effect. The test is a strict one, and <u>a directed verdict for the party having the burden of proof may be granted only where he has established his case by evidence that the jury would not be at liberty to disbelieve</u>. . . . A directed verdict for the party bearing the burden of proof may be granted only if the evidence is such that without weighing the credibility of the witnesses the only reasonable conclusion is in his favor. The court must take as true testimony concerning a simple fact capable of contradiction, not incredible, and standing uncontradicted, unimpeached and in no way discredited by cross examination.

<u>Hurd v. American Hoist & Derrick Co.</u>, 734 F.2d 495, 499 (10th Cir. 1984) (citations and internal quotation marks omitted) (emphasis added).

Because the burden was on Weese to prove that Dr. Schukman breached the standard of care and that Dr. Schukman caused his injuries, we must consider whether the evidence was so overwhelming that a reasonable jury could not have ruled against Weese. The evidence here did not meet this strict standard. In an effort to meet his burden of proof, Weese called two expert witnesses, and cross-examined Dr. Schukman's witnesses. However, it remained within the jury's role as the factfinder to decide that Weese's witnesses were not credible and therefore reject their testimony. <u>See</u> <u>Neece v. IRS</u>, 41 F.3d 1396, 1399 (10th Cir. 1994) (noting that any determination of the credibility of a witness necessarily includes the right of the factfinder to disbelieve the witness). Dr. Schukman did not leave Weese's experts' testimony uncontradicted. Regarding the standard of care, Dr. Schukman and Dr. Von Ruden testified that ordering 100 percent

oxygen was consistent with the standard of care and that, contrary to Weese's experts' testimony, 100 percent oxygen actually was delivered.[1]

Regarding causation, Dr. Schukman, on direct examination of his witnesses and cross-examination of Weese's witnesses, presented evidence to contradict Weese's allegations that Dr. Schukman caused Weese's injuries. First, Dr. Schukman's expert witness, Dr. Welch, as well as Weese's two expert witnesses, Drs. Myers and Hollis, each testified in a way such that the jury could have concluded that Weese's injuries had become irreparable at the time of the initial CO poisoning or at least prior to the time hyperbaric oxygen reasonably could have been delivered, regardless of any subsequent treatment.[2] Second, Drs. Myers and Hollis testified that a poisoning victim must be

---

[1] For example, Dr. Schukman testified that delivering 100 percent oxygen was a satisfactory treatment for carbon monoxide poisoning and that 100 percent oxygen can be delivered with the non-rebreathing mask that was utilized. (II ROA 611-612) Furthermore, Dr. Von Ruden similarly testified that Dr. Schukman met the standard of care by selecting 100 percent oxygen as the treatment for Weese (III ROA 729) and that the non-rebreather mask used can be given a tight fit with nurse assistance. (Id. at 754-55.)

[2] Specifically, Dr. Welch testified that permanent damage begins to occur to a CO poisoning victim within three to five minutes of coming in contact with CO and when poisoning results in unconsciousness, "it is more likely that damage has occurred." Dr. Welch further testified that if nerve cells are deprived of oxygen for eight to ten minutes that "it's all over," regardless of whether you thereafter give hyperbaric treatment or any other treatment. (IV ROA 1100-02) Dr. Hollis agreed that there are certain initial exposures to CO that are so severe that the best possible treatment available may not restore that individual to the condition he was in prior to the accident, and that Weese, when exposed to carbon monoxide poisoning in his jeep, was "very close to death, [he was] very critical, very critically neurologically injured." (Id. at 885-86) Finally, Dr. Myers stated that in cases of severe initial CO intoxication, rendering the patient comatose, there is a danger of permanent injury. (I ROA 223) Dr. Myers stated that 90

(continued...)

treated in a hyperbaric chamber within the first six hours after CO exposure to ensure substantial recovery. Dr. Schukman presented evidence that even if he had ordered Weese transferred when he first took over the care of Weese, the earliest Weese could have reached a chamber would have been six hours and 41 minutes from the time of his initial exposure to the CO source, and six hours and 25 minutes from the time he was removed from the CO source. We also note that there were only two hyperbaric oxygen chambers available at Wesley Hospital and that Weese presented no evidence that either of these chambers was available, nor how those two chambers would have been allocated among Weese and his two young nephews who were also poisoned by the carbon monoxide in the event that hyperbaric treatment were ordered. Finally, Dr. Welch testified that, based upon the half-life of carbon monoxide in the blood and the level of carbon monoxide likely present in Weese, Weese's condition would not have been different if he had been transferred to a hyperbaric chamber.[3]

---

[2](...continued)
percent of his patients who received hyperbaric treatment recovered. However, that statement addressed only patients who had received "immediate" treatment, which of course was not possible with Weese. (Id. at 262-63)

[3] Specifically, Dr. Welch testified as follows:

A.    Looking at the half-lives that we talked about earlier, if one takes Mr. Weese's exposure from the time he was exposed to carbon monoxide to the time he came to the emergency room, the 2 hours 7 minutes there, to the time on the floor that he got 100% oxygen, he would have had 100% oxygen for about 5 hours and 41 minutes total. If he'd had 100% oxygen for 5 hours and 41 minutes total you would have to make assumptions then about what his carboxyhemoglobin level was to begin with, and if you assumed that it was let's say 40%, or 45%, by that

(continued...)

Therefore, as Dr. Schukman presented some evidence contradicting the testimony of Weese's experts, we do not consider the evidence in Weese's favor to be overwhelming and not admitting of any contrary conclusions. Instead, the jury was free to disbelieve Weese's witnesses and accordingly to rule against Weese as the party with the burden of proof.[4]

**Weese's Cross-Appeal**

---

[3](...continued)
> time, that is by the time his oxygen concentration was reduced from 100 to 40%, he would have had negligible carboxyhemoglobin levels or negligible levels of carbon monoxide in his bloodstream.

> . . . .

> Q.    Doctor, in your opinion would Mr. Weese's outcome have been any different given the fact that he had 100% oxygen treatment the way he did in Great Bend, would his outcome have been any different had he been transferred to Wesley by Dr. Schukman?

> A.    In my opinion his outcome would not have been different.

(IV ROA 1136-37, 1143) Dr. Welch also testified that even if Weese's blood contained 75 percent carbon monoxide, the hyperbaric oxygen treatment would not have benefitted his condition any more than 100 percent oxygen treatment. (Id. at 1143)

The district court dismissed these conclusions because they were premised on the belief that Weese was receiving 100 percent oxygen during a portion of his treatment by Dr. Schukman, whereas the district court believed that assumption was not justified by the record. However, as we pointed out at footnote 1 and the associated text, the evidence was such that, taken in the light most favorable to Dr. Schukman, the jury could have drawn that conclusion. And, even if the jury had concluded that there may have been some leakage that diminished the oxygen levels somewhat, the math and examples provided in the testimony could have supported a conclusion that Weese would not have received additional benefits even if he had promptly been ordered by Dr. Schukman to receive hyperbaric treatment.

[4] Because we consider the JML granted in favor of Weese to be improper, we need not decide the remaining issues raised by Dr. Schukman on appeal.

- 11 -

Weese raises two issues on cross-appeal: (1) that the district court erred in failing to grant him a new trial; and (2) that K.S.A. § 40-3403(d), which requires that medical malpractice awards greater than $300,000 be paid in annual installments, violates various provisions of the United States and Kansas constitutions. Because we are restoring the jury verdict in favor of Dr. Schukman, we need not address the constitutionality of K.S.A. § 40-3403(d). Instead, we limit our discussion to whether the court should have granted Weese a new trial. Weese alleges three reasons why the court should have granted a new trial: (1) the district court erred in designating Drs. Welch and Schukman as experts; (2) the verdict was against the weight of the evidence; and (3) Dr. Schukman's counsel engaged in misconduct which prejudiced the outcome.

We review the district court's decision to grant or deny a new trial motion under an abuse of discretion standard. Sheets v. Salt Lake County, 45 F.3d 1383, 1390 (10th Cir.), cert. denied, 116 S. Ct. 74 (1995). We will reverse the denial of a motion for a new trial only if the trial court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances. Id. at 1390-91. However, when the district court's decision turns on an issue of law, we review the district court's determination on that question de novo. A decision to grant a new trial "involves an element of discretion which goes further than the mere sufficiency of the evidence. It embraces all the reasons which inhere in the integrity of the jury system itself." Tidewater Oil Co. v. Waller, 302 F.2d 638, 643 (10th Cir. 1962).

A.    The court's designation of Drs. Welch and Schukman as experts.

Weese's first complaint with Dr. Welch's testimony is that Dr. Welch was not qualified to testify as an expert under Fed. R. Evid. 702 because he conceded he had no experience with hyperbaric oxygen treatment. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form on an opinion or otherwise.

Specifically, Weese argues that the fact in issue was whether Dr. Schukman breached the standard of care by failing to order hyperbaric oxygen treatment. According to Weese, because Dr. Welch had no experience with hyperbaric oxygen treatment, he was unqualified to testify that administering 100 percent oxygen was the equivalent of ordering hyperbaric oxygen.

Weese, however, characterizes the issue in dispute too narrowly. Instead, the issue was whether Dr. Schukman breached the standard of care by not ordering the appropriate treatment for a victim of CO poisoning. Weese does not dispute that Dr. Welch was qualified to testify on what he considered to be the proper treatment of CO poisoning victims. Therefore, his lack of experience with hyperbaric oxygen treatment did not preclude him from testifying regarding another method of treatment for CO poisoning which he believed met the standard of care.

Weese also argues that Dr. Welch testified beyond the scope of his written report and his discovery deposition because in his deposition and report he discussed only

- 13 -

whether Dr. Schukman caused Weese's injuries--not whether Dr. Schukman met the standard of care. Weese refers to <u>Hagedorn v. Stormont-Vail Regional Medical Ctr.</u>, 715 P.2d 2, 5-8 (Kan. 1986), for the proposition that experts may not testify beyond the scope of their pre-trial depositions. However, <u>Hagedorn</u> merely affirmed a trial judge's ruling that an expert for the plaintiff who improperly inspected a hospital without first informing the defendants could not testify live, but could only have his deposition testimony read into the record. Because the expert's deposition was taken before the improper inspection occurred, the trial court simply limited the expert to his deposition testimony as a mechanism to eliminate the possibility that information learned from the improper inspection might come before the jury. That case is not at all helpful to Weese. We see no error in the district court's ruling. In any event, during the deposition of Dr. Welch, Dr. Welch stated that he was prepared to testify regarding whether Dr. Schukman met the standard of care and stated that Dr. Schukman's decision not to transfer Weese was prudent.[5]

---

[5] Specifically, Dr. Welch testified at the deposition:

Q. . . . you are prepared to express an opinion regarding Dr. Schukman; is that correct?

A. I am.

. . . .

Q. Now, I have your report and I think that report is in front of you. You believe that a decision not to transfer was prudent; is that correct?

(continued...)

- 14 -

Finally, Weese argues the district court erred in permitting Dr. Schukman to testify as an expert because Dr. Schukman admitted he was not an expert on carbon monoxide poisoning. However, there is no evidence that the court designated Dr. Schukman as an expert. To the contrary, the court in the order granting Weese's JML motion stated explicitly that it was unnecessary to decide whether Dr. Schukman qualified as an expert witness. Furthermore, the pretrial order did not list Dr. Schukman as an expert witness, but rather as a lay witness. Dr. Schukman does not argue on appeal that he should have been considered an expert witness. Under Fed. R. Evid. 701, a lay witness may testify as to any opinion "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Although Weese does not challenge Dr. Schukman's testimony under the lay opinion rule, we note that any opinions offered by Dr. Schukman were based on his experience as a physician and were clearly helpful to an understanding of his decision making process in the situation. Moreover, in a pretrial order, the district court specifically ruled that Dr. Schukman, as a non-expert, could "testify regarding the standard of care and causation

---

[5](...continued)

A. Was prudent?

Q. Yes.

A. I do.

(I ROA 146-48)

. . . ." (I ROA at 55) Accordingly, the court did not err in admitting Dr. Schukman's testimony.

B. Verdict against the weight of the evidence.

A motion for a new trial made on the ground that the verdict of the jury is against the weight of the evidence normally presents a question of fact and not of law and is addressed to the discretion of the trial court. Richardson v. City of Albuquerque, 857 F.2d 727, 730 (10th Cir. 1988). On review the trial court's decision to deny a motion for new trial will stand absent a showing of manifest abuse of discretion. Id. The court's inquiry focuses on whether the verdict is "clearly, decidedly, or overwhelmingly" against the weight of the evidence. Id. We do not consider this high threshold satisfied here as Dr. Schukman presented evidence both that he met the standard of care by treating Weese with 100 percent oxygen and that any negligence by Dr. Schukman did not cause Weese's injuries.

C. Defense counsel misconduct.

Weese also requested a new trial on the grounds of misconduct on the part of Dr. Schukman's attorneys. In Rodgers v. Hyatt, 697 F.2d 899, 902 (10th Cir. 1983), the court affirmed a district court's granting of a new trial on the grounds that counsel engaged in repeated misconduct "which, in a cumulative perspective, constitute[d] prejudicial trial conduct." Here, Weese alleges four instances of misconduct which resulted in his being prejudiced at trial.

First, Weese alleges that Dr. Schukman during trial intentionally referred to Weese's Texas residency--where he obtained medical treatment, care and counseling following his discharge from the hospital--in order to give the jury the impression that Weese had gone to Texas for treatment for the real purpose of establishing federal diversity jurisdiction. The district court, prior to and during trial, admonished Dr. Schukman's attorney that Weese's domiciliary was not an issue before the jury and that Dr. Schukman was not to raise this issue during trial. Weese alleges that Dr. Schukman ignored these comments and made an issue of Weese's domiciliary nonetheless, giving the jury an impression that Weese and his attorneys were "conniving." However, Dr. Schukman explained that the references to Weese's Texas residency supported his argument asserted at trial that Weese could have received similar health care treatment in Kansas for less expense--an issue directly related to damages.[6]

Second, Weese argues that Dr. Schukman ignored an order of the district court that any witnesses other than those timely designated as expert witnesses could not testify concerning the standard of care or causation, but must limit their testimony to how they treated Weese. Specifically, Weese argues that Dr. Schukman elicited testimony from Dr. Fitzgerald--who treated Weese briefly eight days following the accident--which enabled

---

[6] Dr. Schukman's counsel did make a reference to Weese's Texas residency during his opening statement suggesting that Weese moved to Texas in order to obtain diversity jurisdiction. However, Weese's attorney immediately objected to that remark and the judge upheld that objection and instructed the jury that Weese's domiciliary in Texas was irrelevant to the case and should be disregarded. Although the remarks themselves may have been improper, we do not believe they created any prejudice that would result in granting a new trial.

Dr. Fitzgerald to testify regarding the standard of care although he was only listed as a treating physician. After Weese was transferred to Dr. Fitzgerald's care, Dr. Hollis called Dr. Fitzgerald and recommended that Weese be transferred to a hyperbaric oxygen facility. Dr. Fitzgerald agreed to transfer Weese, but wrote in his treatment notes that Dr. Hollis's suggestion about the benefit of hyperbaric treatment was "not in my experience," apparently referring to a disagreement he had with Dr. Hollis's statement that hyperbaric treatment would benefit Weese. At trial, Dr. Schukman's counsel asked Dr. Fitzgerald what he meant when he wrote "not in my experience." Following a lengthy side-bar caution by the court, Dr. Fitzgerald answered by stating in his opinion, hyperbaric oxygen is not necessary when, as was the case here, the patient was responding to the care being provided.[7]

Weese argues that by eliciting this testimony, Dr. Schukman's attorneys ignored the court's order that Dr. Fitzgerald could not testify regarding the standard of care.

---

[7] Dr. Fitzgerald testified as follows:

Q.    You put ["not in my experience"] in your records. Tell the Court and jury why it was not your -- the reasons for saying that it was not your experience that what Dr. Hollis was saying was true?

A.    My experience relates to taking care of patients of this sort with hyperbaric chambers available to use for treatment immediately, and my experience has been that the only indication for transfer to use of a hyperbaric chamber would be if the patient is not responding to the care that's being given at the time in the facility that happens to see the patient initially. If the patient is being seen and cared for in a close-to-home facility and if the patient is improving, there is no indication for transfer to a hyperbaric chamber.

(IV ROA 1272-73.)

However, we do not interpret Dr. Fitzgerald's testimony as expressing the standard of care doctors must observe when facing a severely poisoned CO victim within hours of the original insult as was the situation with Dr. Schukman; rather, Dr. Fitzgerald testified regarding why he disagreed with Dr. Hollis's opinion that a CO poisoning victim should be given hyperbaric oxygen more than one week after the accident when the victim was in a sub-acute phase and improving under the present treatment. Furthermore, the district court heard Dr. Fitzgerald's proposed testimony in camera prior to permitting Dr. Fitzgerald to testify before the jury. The court ruled that "it would be unfair for him to not be allowed to explain his reasons for believing as he does that [hyperbaric oxygen] will not be helpful during the secondary phase." (IV ROA 1269) It is difficult to believe that Dr. Schukman's attorneys engaged in misconduct when the district court knew what the testimony would be, and explicitly permitted it.

Third, Weese argues that Dr. Schukman ignored the district court's order that he could not compare his fault against the respiratory therapists who may have failed to administer 100 percent oxygen. During both opening statement and closing argument, Dr. Schukman's counsel stated that CKMC employed staff respiratory therapists whose responsibility it was to carry out the doctor's orders with regard to the administration of oxygen. However, we read these statements as supporting an argument advanced by Dr. Schukman that a doctor meets the standard of care merely by ordering 100 percent oxygen.

Fourth, Weese argues that Dr. Schukman ignored the district court's order that he could not compare his fault against Weese's negligence. During opening statement, defense counsel stated that "[t]his is indeed a very unfortunate case in which an individual who was enjoying something that he enjoyed very much got himself in a situation where he was severely injured." Similarly, during closing statement, defense counsel stated that "[t]here's a lot of satisfaction in the practice of medicine, as I understand it, when you see the results and the fruits of your experience and training, when you can take somebody who has got themselves into a situation . . . and you can through your skill and training restore them completely to the condition they were before the accident." We do not consider these statements as rising to the level of Dr. Schukman's counsel attempting to reduce Dr. Schukman's liability by suggesting Weese himself was negligent. Although the statements serve little purpose other than to lessen the jury's sympathy for Weese, we do not consider the passing comments to be overly prejudicial.

## Weese's Fraud on the Court Claim

Weese alleges that Dr. Schukman committed fraud on the court by allegedly concealing certain material facts during discovery and trial. When alleging a claim of fraud on the court, the plaintiff must show by clear and convincing evidence that there was fraud on the court, and all doubts must be resolved in favor of the finality of the judgment. We recently summarized the nature of the "fraud on the court" claim as follows:

> Fraud on the court . . . is fraud which is directed to the judicial machinery itself and <u>is not fraud between the parties or fraudulent documents, false statements or perjury</u>. It has been held that allegations of nondisclosure in pretrial discovery will not support an action for fraud on the court . . . . It is thus fraud where the court or a member is corrupted or influenced or influence is attempted or where the judge has not performed his judicial function--thus where the impartial functions of the court have been directly corrupted.

<u>Robinson v. Audi Aktiengesellschaft</u>, 56 F.3d 1259, 1266 (10th Cir. 1995) (emphasis added) (quoting <u>Bulloch v. United States</u>, 763 F.2d 1115, 1121 (10th Cir. 1985), <u>cert. denied</u>, 116 S. Ct. 705 (1996)). Furthermore, in <u>Rozier v. Ford Motor Co.</u>, 573 F.2d 1332, 1338 (5th Cir. 1978), the court summarized the doctrine as follows:

> Generally speaking, only the most egregious misconduct, such as bribery of a judge or members of a jury, or the fabrication of evidence by a party in which an attorney is implicated will constitute a fraud on the court. Less egregious misconduct, <u>such as nondisclosure to the court of facts allegedly pertinent to the matter before it</u>, will not ordinarily rise to the level of fraud on the court.

(emphasis added.) <u>See</u> <u>also</u> 7 <u>Moore's Federal Practice</u> ¶ 60.33, at 60-360 (noting that fraud on the court should "embrace only that species of fraud which does or attempts to, subvert the integrity of the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication"). "Fraud on the court" is tightly construed because the consequences are severe. It may permit a party to overturn a judgment long after it has become final. Fed. R. Civ. P. 60(b) ("This rule does not limit the power of the court . . . to set aside a judgment for fraud upon the court."). Thus, it runs counter to the strong policy of judicial finality. <u>Robinson</u>, 56 F.3d at 1265-67; <u>see</u>

<u>Moore's Federal Practice</u> ¶ 60.33, at 60-357, 358, 360-61 for examples of what constitutes fraud on the court.

Under our interpretation of the fraud on the court doctrine, Weese's allegations, even if true, cannot properly be characterized as fraud on the court. In essence, Weese is alleging that Dr. Schukman made material misrepresentations or omitted information needed to make his answers fully truthful.[8] However, these allegations, even if true, simply do not rise to the level necessary to constitute "fraud on the court" as that doctrine is articulated in <u>Robinson</u>. In <u>Hazel-Atlas Co. v. Hartford Co.</u>, 322 U.S. 238, 245-46 (1944), overruled on other grounds by <u>Standard Oil of Cal. v. United States</u>, 429 U.S. 17 (1976), the Supreme Court found fraud on the court in a "deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals." At the same time, the Court noted "[t]his is not simply a case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, is

---

[8] Weese made three allegations of fraud: First, Weese argues that Dr. Schukman failed to reveal that he had served as the director of the CKMC emergency room for a time prior to Weese's accident as well as at the time of trial. However, the question concerning whether Dr. Schukman had served in such a role never was asked to him. Second, Weese argues that Dr. Schukman failed to reveal that the emergency room maintained a subscription to Poisindex--a microfiche providing detailed information on how to treat poisoning victims--at the time of Weese's accident. Again, Dr. Schukman was never asked whether the emergency room subscribed to Poisindex and Dr. Schukman never testified that he consulted "all" of the resources available to him at the hospital that night, as Weese alleges. Finally, Weese alleges that Dr. Schukman failed to reveal that CKMC canceled its subscription to Poisindex soon after Weese requested his medical records from the hospital in connection with this litigation. The district court concluded that the decision to cancel Poisindex simply was a business decision by hospital officials, which Dr. Schukman was not required to volunteer to the court. We find no clear error in this conclusion.

- 22 -

believed possibly to have been guilty of perjury." Id. at 245; see also Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118-19 (1st Cir. 1989) (finding fraud on the court when plaintiff and attorney fabricated false purchase agreement and attached it to complaint).

Furthermore, the district court here explicitly found the testimony of Schukman was neither false nor made with an intent to defraud. Aplt. App. at 2391-94. Intent to defraud is an absolute prerequisite to a finding of fraud on the court, Robinson, 56 F.3d at 1267, and the district court's finding of no fraudulent intent is a factual finding that will not be set aside unless clearly erroneous. Id. at 1269. Moreover, the district court found that Schukman's counsel was not guilty of any wrongful or unethical conduct in this regard. Aplt. App. at 2391-93. These findings are not clearly erroneous, and accordingly we affirm the denial of Weese's fraud on the court claim.

**Conclusion**

For the reasons stated above, we REVERSE the order granting judgment as a matter of law in favor of Weese, and REMAND with an ORDER that the jury verdict in favor of Dr. Schukman be reinstated. We AFFIRM the district court's order denying Weese's request for a new trial, and we AFFIRM the district court's order denying relief to Weese on his claim that Dr. Schukman committed fraud on the court.[9]

---

[9] We also reject Dr. Schukman's request for damages and costs related to defending against Weese's appeal of his motion for sanctions.

- 23 -