**CONOCO INC., Plaintiff,**

v.

**J.M. HUBER CORP., Defendant.**

**No. CIV. A. 98–1454–MLB.**

United States District Court,
D. Kansas.

June 29, 2001.

Dennis M. Feeney, Joseph W. Kennedy, Morris, Laing, Evans, Brock & Kennedy, Wichita, KS, for Plaintiff.

Jay F. Fowler, Jim H, Goering, Foulston & Siefkin, L.L.P., Wichita, KS, for Defendant.

## MEMORANDUM AND ORDER

BELOT, District Judge.

### ● INTRODUCTION

The 1970s era energy crunch produced a watershed of litigation regarding the federally mandated price controls on petroleum production. Here, Conoco, the unit operator of oil-producing land during this heavily regulated period, was required to pay overcharges of roughly $60,000 for J.M. Huber's (Huber) receipt of stripper prices and payments from Sun Oil Company in violation of the price controls. Conoco seeks reimbursement plus prejudgment interest. Originally slated for a trial to the court, Conoco has now moved for summary judgment. Doc. 30.[1] Jurisdiction is proper. See 28 U.S.C. § 1331.

### A. Issues Presented

This case presents three primary questions. First, this court must determine whether Conoco has set forth evidence entitling it to judgment under a federal common law claim for restitution. If so, this court must also address the extent to which Huber's affirmative defenses preclude judgment in Conoco's favor. Only if Conoco's entitlement to judgment survives Huber's affirmative defenses will this court determine whether prejudgment interest should be awarded, how long a period such an award will cover, and finally, at what rate such interest ·should be computed.

As discussed more fully below, the court finds that Conoco is entitled to recoup the entire amount of the overcharge liability it incurred on behalf of Huber's receipt of stripper prices and payments in excess of the federally-mandated price control. In so finding, the court denies Huber's identified affirmative defenses. Thus, Conoco's motion is GRANTED.

In addition to the roughly $60,000 of overcharges, the court orders Huber to pay Conoco prejudgment interest at a rate established by 28 U.S.C. section 1961, running from July 30, 1998, the date upon which Conoco first notified Huber of its liability in this matter, up to and including the date judgment is entered pursuant to this Memorandum and Order.

### B. Facts[2]

The facts in this case are largely undisputed. Doc. 42, p. 3–5. The following is a general description of the tortuous litigation history of this matter and a more detailed description of the specific events leading up to this dispute.

1. Also before the court are the following: (1) Conoco's Memorandum in Support of its Motion, (2) Huber's Response, and (3) Conoco's Reply. Docs. 31, 39, and 41. In addition to these pleadings, the court is considering arguments made during the May 2, 2001 Status Conference. At this conference, both Huber and Conoco were invited to file supplemental briefing on the prejudgment interest issue. Both parties have provided submissions. Docs 43 and 44.

2. All facts set forth are either uncontroverted, or, if controverted, taken in the light most favorable, along with all favorable inferences, to Huber. *See Hall v. United Parcel Serv.*, No. Civ. A. 992467–CM, 2000 WL 1114841, at *5 (D.Kan. July 31, 2000) (citing *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998)); *see also United Missouri Bank of Kansas City v. Gagel*, 815 F.Supp. 387, 391 (D.Kan.1993) (stating, in a case where plaintiff moved for summary judgment, all "factual inferences tending to show triable issues" must be viewed in the light most favorable to the existence of those issues). To the extent relevant, the factual disagreements between the parties will be noted.

### 1. Background Facts

#### a. Litigation Concerning Ruling 1974–29

During the 1970s, the Department of Energy (DOE)[3] administered a series of price controls on the sale of crude petroleum. The sale of petroleum from "stripper wells,"[4] however, was exempted from these price controls. This exemption permitted stripper well interest owners to receive a noticeably higher, market-driven price for their oil. It was therefore more profitable to have as many properties classified in such a way to take advantage of this exemption. To avoid this result, the DOE clarified the exception in December 1974 by issuing Ruling 1974–29. This ruling stated that "injection wells" could not be included in the well count when certifying a property as "stripper property."

The first suit challenging the ruling was filed in the District of Kansas on October 6, 1976 by an independent oil producer, Braden–Zenith, Inc. The district court, after consolidating this case with other similar lawsuits, granted a preliminary injunction, pending final resolution upon the merits. DOE was enjoined from enforcing Ruling 1974–29 but the plaintiff-producers were required to "escrow" with the district court the difference between the unregulated price received under the stripper well exemption and the regulated price. This amount is referred to as the "overcharge" because the market price was higher than the controlled price.

On March 17, 1978, Conoco filed a similar suit against the DOE in the Northern District of Texas, seeking to invalidate Ruling 1974–29 and enjoin DOE from imposing civil or criminal penalties against Conoco for any violations of that ruling.

Conoco's suit was consolidated with similar lawsuits brought in that district by other oil producers. The Texas district court also enjoined DOE from enforcing Ruling 1974–29 and ordered Conoco and the other oil-producing plaintiffs to escrow the overcharge amount.

#### b. MDL 378

In July of 1979, the Judicial Panel on Multidistrict Litigation ordered that the consolidated Texas stripper well cases, including Conoco's case, be transferred to the District of Kansas for further proceedings designated as MDL 378. After a trial on the merits, Judge Frank Theis of this court upheld the validity of the stripper well regulations and Ruling 1974 29. The Temporary Emergency Court of Appeals affirmed his ruling and determined the overcharges violated federal price controls. As a result, the district court was ordered to effect restitution of the escrowed overcharges.

In July of 1986, following negotiations among the parties and intervenors in MDL 378 with respect to the appropriate distribution of the escrowed overcharge funds, a "Final Settlement Agreement" (FSA) was reached and approved by the district court. The aftermath of the settlement caused the several billion dollars that had been escrowed with the court to be distributed to the qualifying participants of the FSA. Unfortunately, the FSA did not resolve all remaining issues. Specifically, the remaining liability of the plaintiff-producers for underpayment of overcharges into MDL 378 escrow account was reserved for later resolution by the district court.

---

**3.** The DOE was formerly known as the United States Federal Energy Administration. For purposes of this memorandum and order, it will be called the DOE.

**4.** In a general sense, stripper wells are defined as those wells located on properties with an average maximum daily production of less than ten barrels per well.

### c. Operator Liability

To solve the remaining problem, DOE audited all parties involved in MDL 378, including Conoco, to determine whether any party had underpaid the escrow account. On December 21, 1987, DOE advised Conoco of the results of the audit and of its position that Conoco failed to deposit approximately $4.439 million in overcharges pertaining to the Conoco-owned stripper properties covered by MDL 378. On March 18, 1988, Conoco responded and advised that approximately 80% of the alleged deficiency identified by DOE was attributable to oil taken "in-kind" by third-party interest owners.[5] Conoco claimed it was not responsible for their interests or the alleged overcharges incurred by them because it never certified, sold, or received any revenues regarding these interests. Furthermore, Conoco claimed it did not even know what prices, whether stripper or controlled, had been received by the owners of these interests. Accordingly, Conoco continued to make supplemental deposits into the district court's escrow account, accompanied by the filing of explanatory notices of what Conoco considered to represent its entire liability on the twenty-eight properties it operated. Conoco's supplemental deposits never included the 80% share held by the "in-kind" interest owners.

On December 31, 1992, Conoco moved for summary judgment on the remaining overcharge claim in MDL 378. In its accompanying memoranda, Conoco identified eight properties that its liability as an operator was questioned for oil taken "in-kind," including a property known as the "North East Cherokee Unit" (NECU), located in Alfalfa County, Oklahoma. DOE opposed Conoco's motion and filed a cross-motion for summary judgment, arguing Conoco was liable under the "operator liability" doctrine for all overcharges on the Conoco-operated properties, including the disputed "in-kind" interests.[6]

On December 30, 1994, the district court issued its decision on Conoco's and DOE's motions for summary judgment. The court (1) found that on six of the eight properties, including NECU, Conoco and all other interest owners had received unlawful stripper prices; (2) found that Conoco was liable under the operator liability doctrine for the stripper overcharges received by the third-party in-kind interest owners; and (3) rejected Conoco's defenses based upon various settlements and consent decrees, computational errors, and accrual of prejudgment interest. A journal entry of judgment was filed on February 14, 1995.

### d. Appeal and Settlement of MDL 378

Conoco appealed to the Federal Circuit with respect to only five of the six properties. Liability on NECU was not appealed

---

5. For example, Conoco "operated" properties but did not hold 100% of the oil interests on these properties. Conoco claimed that the interest holders directly received their shares of the oil produced from the properties Conoco "operated." These owners' shares were, according to Conoco, sold by the respective owners directly to an oil purchaser.

6. For background purposes, the "operator liability doctrine" has been described as follows:

Under the operator liability doctrine, the DOE may hold the operator of a crude oil producing property liable for the entire amount of overcharges which occurred, even though the operator may have received only a portion of the overcharges corresponding to its percentage ownership interest in the property. Operator liability has been imposed in at least two general situations: when the operator is the animating force responsible for the overcharges, or when the operator is held liable as a matter of administrative convenience. *In re Dep't of Energy Stripper Well Exemption Litigation,* 743 F.Supp. 1467, 1474–75 (D.Kan.1990) (citations omitted).

because Conoco believed DOE had sufficiently established stripper overcharges with respect to all production at NECU. The appeal proceeded, after being reviewed at least two times by the Federal Circuit, over the next two years. Without going into superfluous details, it is sufficient to say Conoco and DOE eventually entered into a settlement of the entire overcharge dispute. In their approved "Agreed Judgment," Conoco agreed to pay $3.3 million into the MDL 378 escrow account. This settlement payment covered 100% of Conoco's judgment liability for the stripper overcharges of the in-kind owners of NECU, including Huber.

### 2. Case–Specific

With this generalized background in mind, it is now possible to return to 1980 and clarify Conoco and Huber's relationship. From May 1980 through January 1981, known as the "stripper period," Conoco was the operator of NECU. NECU was certified as stripper well property despite the inclusion of injection wells that were on this property. Conoco held roughly a 38% share of the NECU production while the remaining 62% was taken "in-kind" by third-party working interest owners. Huber owned a 3% interest in NECU production.

During the stripper period, Sun Oil Company (Sun) purchased all of the oil production from NECU and, based on the certification of the property as stripper property, paid unlawful stripper prices with respect to all of the working interests in NECU. Huber, like the other third-party working interest owners, took its share of NECU production "in-kind," sold all of it directly to Sun, and was paid directly by Sun. As such, Huber received unlawful stripper prices from Sun for its share of NECU production. While Conoco escrowed its share of the overcharge amount, Huber did not. Conoco now seeks reimbursement for the amount it

had to pay, based upon the imposition of operator liability, for Huber's receipt of these overcharges.

### C. Summary Judgment Standard: FRCP 56

The usual and primary purpose of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." An issue is "genuine" if sufficient evidence exists on each side "so that a rational trier of fact could resolve the issue either way" and "[a]n issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998) (citations omitted); see also *Adams v. American Guarantee & Liability Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir.2000) (citing *Adler*).

### 1. Moving Party's Burden

■ The moving party must initially show both an absence of a genuine issue of material fact, as well as entitlement to judgment as a matter of law. *Id.* at 670. The nature of the showing depends upon whether the movant bears the burden of proof at trial with respect to the particular claim or defense at issue in the motion. If the nonmoving party bears the burden of proof, the movant need not "support its motion with affidavits or other similar materials negating the opponent's" claims or defenses. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548 (emphasis in original). Rather, the movant can satisfy its obligation simply by pointing out the absence of evidence on an essential element of the nonmovant's

claim. *Adler*, 144 F.3d at 671 (citing *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548).

▮▮ On the other hand, if the movant has the burden of proof on a claim or defense raised in a summary judgment motion, it must show that the undisputed facts establish every element of the claim entitling it to judgment as a matter of law. *See e.g., United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir.1991) (*en banc*); *United Missouri Bank of Kansas City v. Gagel*, 815 F.Supp. 387, 391 (D.Kan.1993); *see also Celotex Corp.*, 477 U.S. at 331, 106 S.Ct. 2548 (Brennan, J., dissenting) ("If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence—using any of the materials specified in Rule 56(c) that would entitle it to a directed verdict if not controverted at trial.").[7] Moreover, the moving party must show the absence of genuine issues of fact regarding each of the affirmative defenses specifically reserved by the non-moving party. *Gagel*, 815 F.Supp. at 391. "The party moving for summary judgment must establish its entitlement beyond a reasonable doubt." *Id.*

### 2. Non–Moving Party's Burden

▮▮ If the moving party properly supports its motion, the burden shifts to the nonmoving party, "who may not rest upon the mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Muck v. United States*, 3 F.3d 1378, 1380 (10th Cir.1993). In setting forward these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671. If the evidence offered in opposition to summary judgment is merely colorable or is not significantly probative, summary judgment may be granted. *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 533 (10th Cir.1994). A party opposing summary judgment "cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 793 (10th Cir.1988). Put simply, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### 3. Presentation of Evidence

▮▮ Certain local rules further govern the presentation of facts and evidence. Local Rule 56.1 requires the movant to set forth a concise statement of material facts. D. Kan. Rule 56.1. Each fact must appear in a separately numbered paragraph and each paragraph must refer with particularity to the portion of the record upon which the defendant relies. See *id.* The opposing memorandum must contain a similar statement of facts. Plaintiff must number each fact in dispute, refer with particularity to those portions of the record upon which he relies and, if applicable, state the number of the defendants' fact that he disputes. The court may, but is not obligated to, search for and consider evidence in the record that would rebut the defendant's evidence, but that plaintiff has failed to cite. See *Mitchell v. City of Moore*, 218

---

7. The court notes that the Rule 56 summary judgment standard is identical to that of a Rule 50 judgment as a matter of law standard, *see Pendleton v. Conoco, Inc.*, 23 F.3d 281, 286 (10th Cir.1994), and that "[t]he standard is particularly strict when such a ruling is made in favor of the party with the burden

of proof." *Weese v. Schukman*, 98 F.3d 542, 547 (10th Cir.1996). Under this strict test, the party bearing the burden of proof at trial earns a favorable ruling only when evidence is presented that "the jury would not be at liberty to disbelieve." *Weese*, 98 F.3d at 547.

F.3d 1190, 1199 (10th Cir.2000); *Adler,* 144 F.3d at 672. All material facts set forth are deemed to be admitted for the purpose of summary judgment unless specifically controverted. See *Gullickson v. Southwest Airlines Pilots' Ass'n,* 87 F.3d 1176, 1183 (10th Cir.1996) (applying local rules of District of Utah). A standing order of this court also precludes drawing inferences or making arguments within the statement of facts.

■■■■ The parties need not present evidence in a form that would be admissible at trial, but the content or substance of the evidence must be admissible. See *Thomas v. International Bus. Mach's.,* 48 F.3d 478, 485 (10th Cir.1995) (internal quotations and citations omitted). For example, hearsay testimony that would be inadmissible at trial may not be included. See *Adams,* 233 F.3d at 1246. Similarly, the court will disregard conclusory statements and statements not based on personal knowledge. See *Cole v. Ruidoso Mun. Schs.,* 43 F.3d 1373, 1382 (10th Cir.1994) (regarding conclusory statements); *Gross v. Burggraf Constr. Co.,* 53 F.3d 1531, 1541 (10th Cir.1995) (requiring personal knowledge). Finally, the court may disregard facts supported only by references to documents unless the parties have stipulated to the admissibility of the documents or the documents have been authenticated by and attached to an affidavit meeting the requirements of Rule 56(e). See Fed. R.Civ.P. 56(e); D. Kan. Rule 56.1; 10A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Federal Practice and Procedure § 2722 (2d ed.1983) (footnotes omitted).

4. Summary

In the end, when confronted with a fully briefed motion for summary judgment, the court must determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If sufficient evidence exists on which a trier of fact could reasonably find for the plaintiff, summary judgment is inappropriate. See *Prenalta Corp. v. Colorado Interstate Gas Co.,* 944 F.2d 677, 684 (10th Cir.1991).

• **ANALYSIS**

**A. Conoco's Claim for Restitution**

While recognizing the operator liability doctrine and its often harsh, unjust results, the courts nevertheless have permitted operators to seek reimbursement under a federal common law action for restitution against the individual interest owners. *See, e.g., Exxon Corp. v. Jarvis Christian College,* 746 F.Supp. 652, 655 (E.D.Tex. 1989) (recognizing, while sitting in equity, "an implied cause of action under federal common law for reimbursement"). The federal courts have recognized that this new cause of action was necessary because the operators shouldered responsibility based not upon legal culpability but due to administrative necessity. See *In re Department of Energy Stripper Well Exemption Litigation,* 743 F.Supp. 1476, 1482–83 (D.Kan.1990). Thus, the courts have reasoned that fairness required the operators to receive an equitable opportunity to recoup losses from the actual interest holders. See *In re Department of Energy Stripper Well Exemption Litigation,* 968 F.2d 27, 37 (T.E.C.A.1992) (stating there was an "implicit understanding" that the operator "had recourse against other parties for reimbursement of parts of the overcharges").

■■■ Neither the parties nor the court have identified any published Tenth Circuit opinion discussing the "elements" of a federal common law action for restitution. Most cases discussing this cause of action,

however, typically note that (1) there has been an adjudication of operator liability against the plaintiff, (2) the plaintiff has paid in excess of its share of price control overcharges, and (3) the party against whom the operator is seeking reimbursement has not paid its share of the overcharges to either DOE or plaintiff. See, e.g., *In re Department of Energy Stripper Well Exemption Litigation,* 968 F.2d 27, 37 (T.E.C.A.1992); *In re Department of Energy Stripper Well Exemption Litigation,* 743 F.Supp. 1467, 1475 (D.Kan.1990) ("Following imposition of sole liability on the operator, the operator has the burden of pursuing each individual working interest and royalty interest owner to recover the overcharges which that interest owner received."). Conoco claims that its statement of facts, uncontroverted in relevant part by Huber, set forth the essential elements that entitle it to recovery under this cause of action: (1) there has been an adjudication of operator liability against it for NECU, (2) Huber has received and retained monies in excess of the regulated price, and (3) there has been a judgment and payment of these overcharges by Conoco. Doc. 31, p. 19.

Huber essentially has conceded the elements of Conoco's claim for reimbursement: "Huber does not contest [the November 1997] settlement [with DOE], its reasonableness, or the doctrines on which Conoco relies. Instead, Huber has raised two affirmative defenses to Conoco's claim." Doc. 39, p. 3. In light of the statements made in Huber's brief and during the status conference, this court believes Huber does not contest Conoco's entitlement to judgment on the reimbursement claim unless one of its (Huber's) affirmative defenses precludes such recovery. See *Vallejos v. C.E. Glass Co.,* 583 F.2d 507, 510 (10th Cir.1978) ("As a general rule, a stipulation is a judicial admission

binding on the parties making it, absent special considerations."). Even if this were not Huber's position, the court finds Conoco has, absent a valid affirmative defense to the contrary, presented sufficient evidence to justify awarding its requested relief on the restitution claim. See *In re Department of Energy Stripper Well Exemption Litigation,* 968 F.2d 27, 38 (T.E.C.A.1992) (finding operator was entitled to summary judgment on its third-party claim for restitution).

## B. Huber's Affirmative Defenses

 Simply because Conoco has established the necessary elements to restitution, however, does not mean it is entitled to judgment. "Once the operator has asserted this cause of action, [Huber has] the opportunity to raise affirmative defenses...." *Louisiana Land & Exploration Co. v. Unocal Corp.,* 863 F.Supp. 306, 309 (E.D.La.1994). Being an equitable remedy, both legal and equitable defenses may be asserted. See *id.* (addressing a breach of contract defense); *Jarvis Christian College,* 746 F.Supp. at 655 (stating operator owed a quasi-fiduciary duty).

In the present case, Huber has asserted two affirmative defenses. First, Huber asserts a 1981 consent decree between it and DOE "settled any Huber liability for violations of federal petroleum price regulations, including any stripper well overcharges." Doc. 39, p. 3. In addition, Huber asserts a "notice" defense, claiming, inter alia, Conoco failed to inform Huber of this potential liability and therefore violated Conoco's fiduciary or "analogous" duty to keep Huber informed of the potential for judgment. Doc. 39, p. 3–4. These arguments are invalid as a matter of law.

### 1. Burdens of Proof[8]

Before addressing the merits of these two defenses, a point of clarification re-

**8.** Prior to the May 2, 2001 scheduling confer- ence, the court drafted a letter to the parties

garding the applicable summary judgment burdens of proof must be made. Unless Huber's affirmative defenses are valid, Conoco is entitled to judgment on the restitution claim. There can be little doubt Conoco's motion for summary judgment must be denied if one of Huber's affirmative defenses bars relief or if material facts (or inferences from those facts) exist as to the validity of an affirmative defense. See *United States v. Frey*, 708 F.Supp. 310, 312 (D.Kan.1988) (addressing, sua sponte due to defendant's failure to respond to plaintiff's summary judgment motion, two affirmative defenses preserved in the pretrial order); see also *Office of Thrift Supervision v. Paul*, 985 F.Supp. 1465, 1469–70 (S.D.Fla.1997) (noting summary judgment may be inappropriate even if the parties agree on the basic facts but disagree about the inferences derived from those facts). The parties' respective burdens at this stage are less certain, considering Conoco, the plaintiff, has moved for summary judgment and Huber, the defendant, is left with only its affirmative defenses to thwart Conoco's motion.

 Finding no Tenth Circuit case directly on point, the court must look elsewhere for persuasive authority. Other jurisdictions hold that a defendant relying solely upon an affirmative defense to thwart a plaintiff's summary judgment motion must establish both the applicability of the defense(s) and triable issues of fact as to the existence of each essential element of that defense. *See Herndon v. Massachusetts Gen. Life Ins. Co.*, 28 F.Supp.2d 379, 382 (W.D.Va.1998) (citing *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54–55

(2d Cir.1994)); *Paul*, 985 F.Supp. at 1470 (citing *Blue Cross & Blue Shield v. Weitz*, 913 F.2d 1544, 1552 (11th Cir.1990)). Conoco needs only establish the inapplicability of the identified defense(s) or that an essential component of an asserted defense is missing. Cf. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)) ("While whatever evidence there is to support an essential element of an affirmative defense will be construed in the light most favorable to the non-moving defendant, there is 'no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.'" (emphasis in original)). With the parties' respective responsibilities established, a more focused analysis of Huber's affirmative defenses may be undertaken.

### 2. Affirmative Defenses

#### a. 1981 Consent Decree

Initially, Huber claims the 1981 Consent Decree it entered into with DOE covers the overcharge liability from NECU and therefore Conoco's claim for reimbursement is invalid. Doc. 39, p. 10. In response, Conoco argues this defense is substantively meritless and should not preclude summary judgment in its favor. Doc. 41, p. 7.[9] Because the 1981 Consent Decree does not specifically include the liability at issue here, the court denies this defense.

---

informing them that the following standard would be applied. Neither party voiced any objection to this standard.

**9.** Huber has argued Conoco should not be permitted to address Huber's affirmative defenses for the first time in Conoco's reply brief. The court has considered Huber's posi-

tion but determined the decision rests solely within the bounds of judicial discretion. At the May 2, 2001 Scheduling Conference, Huber was given an opportunity to respond to Conoco's arguments by oral argument and/or subsequent briefing on Conoco's arguments. Huber declined this opportunity.

**(1) Contents of the Consent Decree**

During the price-regulated era of the 1970', DOE audits of energy-producing companies apparently were a common occurrence. Based upon one of these audits, DOE concluded that Huber had violated federal petroleum price regulations "in effect during the period from September 1, 1973 through January 28, 1981." Doc. 39, Ex. A. To resolve this dispute, Huber agreed to pay DOE $718,000.[10] DOE agreed this settlement resolved "[a]ll civil matters pertaining to compliance with the DOE petroleum price regulations and prices charged by Huber in sales of NGL and NGL products during the period September 1, 1973 through January 28, 1981...." Doc. 39, Ex. A.

**(2) Judicial Treatment of Consent Decrees**

Several price-regulation cases have addressed the impact DOE Consent Decrees have upon existing litigation when an operator seeks reimbursement for liability incurred as a result of the operator liability doctrine. *See, e.g., Murphy Exploration & Prod. Co. v. Oryx Energy Co.,* 101 F.3d 670 (Fed.Cir.1996); *Exxon Corp. v. Jarvis Christian College,* No. TY–80–4320–CA, 1991 WL 771247 (E.D.Tex.1991). While no discernable framework has been established, the courts have, at the very least, construed and applied these agreements according to their literal terms. Compare *In re Dep't of Energy Stripper Well Exemption Litigation,* 874 F.Supp. 1161, 1180–81 (D.Kan.1994) (leaving open the possibility of a reimbursement action)[11]; and *Jarvis Christian College,* 1991 WL 771247, at *2 (stating consent decrees entered into by working interest owners did not prohibit an action for restitution by

the operator); with *Murphy Exploration & Production Co. v. Oryx Energy Co.,* 101 F.3d 670, 674 (Fed.Cir.1996) (criticizing the court in *Jarvis Christian College,* 1991 WL 771247, for characterizing a settlement as "irrelevant" to the issue of reimbursement and finding the interest owner's agreement with DOE applied to an unlimited array of potential liabilities for violations of "federal petroleum price and allocation regulations"). This generalized observation is sufficient to address the issue of whether Huber's 1981 Consent Decree, by its terms, bars Conoco's claim.

**(3) Application**

■ Under any reading, literal or otherwise, the court finds Huber's 1981 Consent Decree does not cover the litigation at issue in this case. Huber's Consent Decree stated it resolved all violations of petroleum price regulations as they related to the sales of NGL and NGL products. Doc. 39, Ex. A. Here, the dispute is not about violations of the federal petroleum regulations for natural gas liquids but rather the overcharges relating to the price received for crude petroleum obtained from improperly classified stripper well properties. Doc. 41, p. 8. The Consent Decree, by its terms, applies only to the former, not the latter. Doc. 39, Ex. A. Accordingly, Huber's 1981 Consent Decree, by its literal terms, does not preclude Conoco's claim for reimbursement.

**b. Notice/Fiduciary Duty**

While the Consent Decree, by itself, is insufficient to preclude judgment in Conoco's favor, Huber folds it into its broader defense that Conoco's failure to inform it of the potential for restitution liability at

---

**10.** The Consent Decree, however, "constitutes neither an admission by Huber nor a finding by DOE that Huber has violated any statutes or applicable regulations...." Doc. 39, Ex. A.

**11.** This case was, as discussed below, appealed and vacated. *See Conoco, Inc. v. Department of Energy,* 99 F.3d 387 (Fed.Cir.1996).

NECU breached Conoco's duty as an operator to keep Huber informed. This duty, Huber argues, derives from Conoco's status as a fiduciary or quasi-fiduciary of Huber. Doc. 39, p. 11 (citing Oklahoma law). As an illustration of how Conoco's failure in this respect harmed Huber, Huber points to the 1981 Consent Decree and argues its (Huber's) lack of knowledge regarding this potential liability prevented the incorporation of broader terms to cover such liability.

#### (1) Choice of Law

Before measuring the merit of Huber's notice/fiduciary duty defense, the court must first determine whether Huber justifiably assumes that Oklahoma law applies. For some time it has been clear that a federal court, sitting in diversity, is required to apply the choice of law principles of the state where the court sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Antonson v. Robertson*, 141 F.R.D. 501, 508 (D.Kan.1991). In this case, however, Conoco's cause of action invokes a federal question, thus this court's jurisdiction arises under 28 U.S.C. § 1331, not § 1332. Moreover, the issue currently under consideration is not a claim, but rather Huber's state law defense to Conoco's federal cause of action. Despite this somewhat unique circumstance, the court finds that Klaxon is nonetheless applicable. *Cf. Loveridge v. Dreagoux*, 678 F.2d 870, 877 (10th Cir.1982) (stating the same conflict of laws doctrine applies when jurisdiction is based upon federal question). As such, the court applies the choice of law principles utilized by Kansas courts.[12] *See, e.g., Abbott v. Chemical Trust*, No. 01–2049–

JWL, 2001 WL 492388 (D.Kan. Apr.26, 2001).

To find the applicable substantive law regarding breach of fiduciary duty claims, Kansas courts ordinarily look to the law of the state where the injury occurred. *See, e.g., Antonson*, 141 F.R.D. at 508–09 (stating that most cases apply the law where the injury occurred); *Fusion, Inc. v. Nebraska Aluminum Castings, Inc.*, No. 95–2366–JWL, 1997 WL 51227, at *24 (D.Kan. Jan.23, 1997) (applying Nebraska law because that is where the financial injury was felt). In other situations, courts apply the law of the jurisdiction where the obligation or duty arose. *See Brown v. Mailman*, No. 95–2181–JWL, 1995 WL 716785, at *3 (D.Kan. Nov.13, 1995) (applying the law of the state of incorporation because the fiduciary duty was created by corporate law). Here, the court agrees with Huber's position that the law of Oklahoma, the state where the alleged failure to perform the fiduciary obligations occurred, should be applied. *See Redmond v. Alexander*, No. Civ. A. No. 88–2516–L, 1992 WL 371616, at *3 n. 2 (D.Kan. Oct.28, 1992) (applying the law of the state where the breach of the fiduciary duty occurred); *Antonson*, 141 F.R.D. at 509 (stating, albeit in dicta, the breach of fiduciary duty claim would be measured according to the law of the state where the injury occurred).[13]

#### (2) Fiduciary Duty in Oklahoma

In support of its second affirmative defense, Huber argues that (1) under Oklahoma law, Conoco's fiduciary "status," as an operator, to Huber, an inter-

---

**12.** Neither party raised this issue.

**13.** While there may be an argument, relying on Fusion, Inc., that Huber felt the effects of this financial injury in its corporate offices in New Jersey, Conoco has not raised this point.

Doc. 41, p. 9. As such, this point is deemed to have been waived. See *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n. 10 (10th Cir.2001) (stating an unsupported point is deemed to have been waived).

est owner, is "well established;" (2) the duty of fiduciaries to inform their beneficiaries about relevant matters is also well established; and (3) a breach of the duty to inform beneficiaries negates or at least minimizes the fiduciary's right to reimbursement from the uninformed beneficiary. Doc. 39, p. 10–12. From these generalized statements of the law and its uncontroverted allegations of fact (Doc. 39, ¶¶ 5–9),[14] Huber claims any right of Conoco to receive reimbursement for the stripper overcharges is negated. Conoco disagrees, claiming that no case involving common law restitution has ever recognized "an absolute concomitant duty of notification upon the operator." Doc. 41, p. 9. Because the court finds Oklahoma law does not recognize a fiduciary obligation to the extent Huber seeks, the court denies Huber's second affirmative defense.

■■■ In Oklahoma, like many other jurisdictions, the courts have refused to set forth one definition of when a fiduciary relationship exists. *See First Nat'l Bank & Trust Co. of Vinita v. Kissee*, 859 P.2d 502, 510–11 (Okla.1993) (citing cases from as far back as 1924); *see also Denison State Bank v. C.C. Madeira*, 230 Kan. 684, 640 P.2d 1235, 1241 (Kan.1982) (surveying the law and noting the general trend to avoid a mechanical definition of fiduciary relationships). In the most general sense, a fiduciary relationship will be recognized when the attendant facts show a special relationship of trust existed between the parties on a particular issue. *See, e.g., Mahan v. Dunkleman*, 205 Okla. 54, 234 P.2d 366, 370 (Okla.1951) (quoting *Derdyn v. Low*, 94 Okla. 41, 220 P. 945 (Okla. 1923));[15] *see also Garrett v. Bryan Cave LLP*, No. 98–6282, 2000 WL 430163, at *3 (10th Cir. Apr.21, 2000) (noting Oklahoma courts find fiduciary relationships arise when one party places an attitude of trust, confidence, and superior knowledge with the other party). Facts relevant to such a conclusion include whether a party relied upon, sought advice from, was manipulated by, placed unwarranted trust in, or was led to believe, in any way, the other party was looking out for the beneficiary's interests. *See Kissee*, 859 P.2d at 511.

### (3) Application of Oklahoma Fiduciary Law to Uncontroverted Evidence

The court agrees, to some extent, with both Huber's and Conoco's positions. First, Oklahoma law does recognize that some fiduciary relationship exists between unit operators and interest owners. *See, e.g., Leck v. Continental Oil Co.*, 800 P.2d 224, 228–29 (Okla.1989) (surveying cases recognizing the operator's duty). It is under this relationship that several duties arise. For example, Oklahoma law has recognized that operators have a duty to maximize unit production, sell the oil at a fair price, and, in general, operate the unit a prudent operator. These duties are not

14. In paragraphs five through nine, Huber states Conoco failed to inform it that (1) NECU was classified as stripper property despite the inclusion of injection wells in the well count, (2) NECU was involved in stripper well litigation, (3) DOE was contending Huber received overcharges from NECU, (4) Huber was facing potential liability in the stripper well litigation, and (5) Conoco was escrowing their share of stripper charges. Doc. 39, ¶¶ 5–9.

15. In *Derdyn*, the Court's syllabus stated:

A "confidential relation" arises by reason of kinship between parties, or professional, business, or social relations that would reasonably lead an ordinary prudent person in the management of his business affairs to repose that degree of confidence in the defendant which largely results in the substitution of the will of the defendant for that of the plaintiff in the material matters involved in the transaction.

*Derdyn v. Low*, 94 Okla. 41, 220 P. 945, 945 (Okla.1923).

unique to the oil business. They are simply common sense applications of the general notions of fiduciary law.

 Nothing in Oklahoma law, however, indicates that these general fiduciary duties reach to the extent Huber seeks. As an initial matter, it is unclear whether Oklahoma law would even recognize that a fiduciary relationship exists with respect to this particular issue. For example, in *Kissee*, the Oklahoma Supreme Court held that no fiduciary relationship existed between a bank and its customer with respect to the customer's business and private investments. *Kissee*, 859 P.2d at 511. Thus, while there would certainly be a fiduciary relationship between a bank and its customer if the customer entrusts money to the bank, no such relationship exists when the customer fails to "repose any special confidence" in the bank in other situations. *Cf. Mahan v. Dunkleman*, 205 Okla. 54, 234 P.2d 366, 370 (Okla.1951) (finding the relationship was not sufficient to justify lowering the proposed beneficiary's "sense of security"). The same can be said here. While Huber, as the royalty interest owner, reposed a special trust that Conoco would maximize unit production, there is no evidence that Huber relied (justifiably or otherwise) upon Conoco to provide information regarding Conoco's dealings with DOE and its regulations. Neither is there any evidence that Conoco ever promised to undertake this obligation or has in any way obstructed Huber from, on its own initiative, inquiring about this information. Quite simply, there is no justification for finding a fiduciary relationship existed with respect to Conoco's dealings with DOE.

 While there is good reason to believe that no fiduciary relationship existed between Conoco and Huber as to the DOE matter, the court also finds that even if a general fiduciary relationship did arise, Oklahoma law did not impose upon Conoco a duty to notify Huber of the information which Huber contends Conoco should have provided. As discussed above, Oklahoma fiduciary law seeks to prevent unfair manipulation by one in a superior position. To accomplish this goal, the law imposes obligations to, inter alia, safekeep property, conduct business in a manner that maximizes profits, and generally to treat the beneficiaries with utmost care. None of these simple obligations hints at or even approaches the threshold that Huber seeks. A review of the cases cited by Huber illustrates the broad chasm between Huber's position and established Oklahoma law.

To begin with, the duty recognized in *Leck* and the cases it relies upon establish that an operator has an obligation to maximize the profitability of the royalty owner's share of the mineral rights. *See Leck v. Continental Oil Co.*, 800 P.2d 224, 228–29 (Okla.1989) (noting a fiduciary duty to protect the royalty owner's interests in production). For example, *Leck* noted the case of *Samson Resources Co. v. Corporation Commission*, 702 P.2d 19, 23 (Okla. 1985) held the unit operator had a duty to safeguard "the correlative rights" of the interest holders and conduct operations as a prudent operator. *See Leck*, 800 P.2d at 228. No allegation has been made that Conoco failed to meet this duty. While *Leck* is the case Huber primarily relies upon for its position that Conoco owed a duty to inform it of the stripper well information, neither *Leck* nor *Samson* even hints that such a duty exists.

*Leck* also cites *Reserve Oil, Inc. v. Dixon*, 711 F.2d 951 (10th Cir.1983) and *Young v. West Edmond Hunton Lime Unit*, 275 P.2d 304 (Okla.1954) for the proposition that an operator has a duty to ensure the production is sold at the market price. *See Leck*, 800 P.2d at 228–29. Again, no allegation is made that Conoco

sold Huber's interest at a below-market price. In fact, Conoco's actions permitted Huber, which took its share of NECU production "in-kind" and sold it directly to Sun Oil, to receive full market price instead of the lower, federally-regulated price. And, while requiring Huber to disgorge these overcharges to Conoco will result in Huber ultimately receiving less than market price, DOE and its regulations are to blame, not Conoco.

 *Leck* also relies on *Olansen v. Texaco, Inc.*, 587 P.2d 976, 984 (Okla.1978) for the proposition that a unit operator owes a fiduciary duty to a royalty owner. *See Leck*, 800 P.2d at 229. Though *Olansen* has not been addressed by either party, it does contain some language suggesting that the unit operator owes a royalty owner a duty to notify them of important changes.[16] *See Olansen*, 587 P.2d at 983–84. The court does not disagree with this proposition, but finds the classification (not even a re-classification) of a unit is not the type of information operators are required, without inquiry, to convey to interest holders. This view is illustrated by a closer look at the issue in *Olansen*. There, the unit operator, due to the operator's incomplete bookkeeping, failed to make a royalty payment to a royalty owner and failed to notify the royalty owner of the initiation of unitization proceedings. *See Olansen*, 587 P.2d at 980 (noting the unit operator instead paid the former owner of the royalty interest because the former owner was still the owner of record on the unit operator's books). *Olansen* does not compel the adoption of Huber's position because, like *Leck*, *Samson Resources*, and *Dixon*, it addresses only the fundamental fairness issue of managing the royalty owner's finances and interest in the unit. This common sense duty, akin to that recognized and discussed in *Leck*, cannot be stretched to require the notification Huber is proffering.

(4) Summary

In the end, the court agrees that Oklahoma law wisely imposes upon a unit operator a fiduciary duty. That duty, however, does not extend to and address the situation presented here. As such, Huber's second and final affirmative defense must be denied.

3. Entry of Judgment

Finding Huber has failed to assert a valid affirmative defense[17] to Conoco's claim, judgment shall be entered in Conoco's favor in the amount of $60,178.37.[18]

## C. Prejudgment Interest

The final step in this court's analysis is determining whether Conoco is entitled to prejudgment interest and, if so, to what

---

16. Of course, as recently reaffirmed by the Supreme Court, this court is bound not by the language of prior opinions but rather by their holdings. *See Alexander v. Sandoval*, 531 U.S. 1049, 121 S.Ct. 1511, 1517, 149 L.Ed.2d 517 (2001) (stating "this Court is bound by holdings, not language"); *see also Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health & Human Resources*, — U.S. —, 121 S.Ct. 1835, 1849, 149 L.Ed.2d 855 (2001) (Scalia, J., concurring) (declining to follow the Court's prior misleading dicta); *Atwater v. City of Lago Vista*, — U.S. —, 121 S.Ct. 1536, 1550, 149 L.Ed.2d 549 (2001) (discounting an "isolated sentence").

17. At the May 2, 2001 Scheduling Conference, Huber expressed a belief their second "notice" defense encompassed varying theories, such as estoppel, "quasi-estoppel," and laches to name a few. The court, like Huber, has not specifically addressed these in the text, but has considered them fully and finds them to be without merit as to the issue of Conoco's entitlement to judgment.

18. Huber states in its Additional Uncontroverted Facts that its share of overcharges for NECU is $60,178.37. Doc. 39, ¶¶ 1, 2. Conoco admits this is the correct figure. Doc. 41, p. 3.

extent such interest shall be awarded, both in duration and rate. Based upon the legal framework set forth by the Tenth Circuit, the court determines Conoco is entitled to receive prejudgment interest. Due to the attendant equitable considerations, however, the length of time the court holds Huber responsible for such interest is significantly less than what is argued by Conoco. Finally, the court finds that rate of prejudgment interest shall be computed according to the federal post-judgment interest statute, 28 U.S.C. § 1961.

### 1. Legal Framework

 In the Tenth Circuit, prejudgment interest is ordinarily awarded on successful federal claims. *See Swift–Eckrich, Inc., v. Advantage Systems, Inc.,* 55 F.Supp.2d 1280, 1289 (D.Kan.1999) (citing *FDIC v. UMIC, Inc.,* 136 F.3d 1375, 1388 (10th Cir.1998)) (noting that while it is not awarded as a matter of right, the presumption nonetheless exists). This court, guided by a balance of equitable considerations, has considerable discretion in determining whether such relief is appropriate. *See Towerridge, Inc. v. T.A.O., Inc.,* 111 F.3d 758, 763 (10th Cir.1997). These considerations are implemented in the two-step analysis first set forth in *U.S. Industries, Inc. v. Touche Ross & Co.,* 854 F.2d 1223, 1257 (10th Cir.1988).[19] First, this court must determine whether an award of prejudgment interest will compensate Conoco for the lost time value of the money. *See Malloy v. Monahan,* 73 F.3d 1012, 1019 (10th Cir.1996). If an award will serve a "compensatory function," this court must then determine whether the equities preclude awarding prejudgment interest. *See Kleier Adver., Inc. v. Premier Pontiac, Inc.,* 921 F.2d 1036, 1042 n. 4 (10th Cir.

1990) (stating an award of prejudgment interest should be governed by fairness). Huber admits that Conoco would be compensated by an award of prejudgment interest but claims several equitable considerations prevent the imposition of such an award. Doc. 41, p. 3.

### 2. Relevant Dates and Events

Because Conoco seeks prejudgment interest over such a long period of time and the primary basis for this court's decision in denying Conoco's full request is based upon the extreme attenuation between relevant events, a review of the important dates is appropriate. First, as noted earlier, the time during which Huber received unlawful stripper prices and the time for which Conoco had to pay began in May 1980 and continued through January 1981. Doc. 31, ¶ 13. From January 1981 through December 1994, Conoco litigated the legality of and the ultimate responsibility for the stripper overcharges with DOE. Summary judgment in favor of DOE was granted and judgment was thereafter entered against Conoco in February 1995. Doc. 31, ¶ 20. Conoco then appealed various issues involving other stripper properties unrelated to NECU. The Federal Circuit eventually remanded the case to the district court for further proceedings. In November of 1997, however, DOE and Conoco concluded the matter by entering into a global settlement agreement encompassing all Conoco liability. Doc. 31, ¶¶ 24, 25. Finally, after entering this settlement agreement, Conoco, on July 30, 1998, sent a formal demand letter to Huber. This letter allegedly detailed the foregoing events and requested Huber remit its share of the overcharges that Conoco paid to DOE. The parties stipulate this commu-

---

**19.** Several subsequent Tenth Circuit opinions have recognized the implied abrogation of Touche Ross on other grounds but have con-

tinued to apply this two-part analysis. *See, e.g., Okland Oil Co. v. Conoco Inc.,* 144 F.3d 1308, 1317 (10th Cir.1998).

nication was the first time Conoco informed Huber that Huber was alleged to have received overcharges for NECU production. Doc. 42, p. 5, ¶ K; Doc. 39, ¶ 5.

3. Balancing the Equities

Huber does not dispute the compensatory effect that an award of prejudgment interest will have to Conoco. Instead, it relies, once again, on the amalgamated "notice" defense, claiming equitable factors, which this court must consider, preclude awarding prejudgment interest, at least to the extent requested. Specifically, Huber claims a lengthy period of prejudgment interest will permit Conoco to profit from figuratively "keeping Huber in the dark." Doc. 43, p. 3–4. This argument, or at least some variation it has been rejected by the Temporary Emergency Court of Appeals in similar contexts on at least two occasions.[20] *See Lea Exploration, Inc. v. Department of Energy*, 843 F.2d 510, 513 (T.E.C.A.1988) (citing *Citronelle–Mobile Gathering, Inc. v. Herrington*, 826 F.2d 16, 29 (T.E.C.A.1987) as support for its rejection of the argument that the government's four year delay in informing property owner of a potential violation warranted reducing an award of prejudgment interest).[21] Accordingly, were the issue purely an exercise in applying mechanical legal precepts, this court might be justified in imposing upon Huber prejudgment interest dating back to the stripper period.

▪ This court's decision, however, is not based solely upon legal principles. Rather, the judgment in this case, though informed by the law, must be based upon an exercise of sound discretion in light of the equitable principles given the particular facts of this case. *See Malloy v. Mon-*

*ahan*, 73 F.3d 1012, 1019 (10th Cir.1996) (finding district court did not abuse its discretion when denying, in a 42 U.S.C. § 1983 action, prejudgment interest based upon equity); *Anixter v. Home–Stake Prod. Co.*, 977 F.2d 1549, 1554 (10th Cir. 1992) (stating that fundamental considerations of fairness factor into the prejudgment interest decision); *U.S. Indus., Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1257 (10th Cir.1988) (stating that even if an award of prejudgment interest would be compensatory, the court must nonetheless determine whether "the equities would preclude the award of prejudgment interest"). The court agrees that Conoco is entitled to prejudgment interest. The amount, or, more specifically, the length of time such interest should be equitably permitted is another matter.

Based upon equitable principles and a sense of fairness, the court concludes prejudgment interest should be computed from the date judgment pursuant to this Memorandum and Order is entered back to the date that Conoco first notified Huber of its potential liability, July 30, 1998. Conoco has made legal arguments that Huber should be responsible for prejudgment interest dating back to either the close of the stripper period, the date judgment was initially entered against Conoco, or even when the date the settlement with DOE was finalized. These arguments do not, however, overcome Conoco's unexplained failure to at least offer Huber the ability to satisfy its obligation at an earlier point in time.

a. Equity and Fairness

Fairness does not permit Conoco to maintain its status as the master of NECU liability throughout the long course of liti-

---

**20.** The Federal Circuit has adopted the precedent established by the Temporary Emergency Court of Appeals. See *Murphy Exploration*

*& Prod. Co. v. Oryx Energy Co.*, 101 F.3d 670, 673 n. 4 (Fed.Cir.1996).

**21.** These cases were not cited by either party.

gation and then, when its ultimate responsibility is determined some 16 years later, ask Huber to pay for the interest that had been accruing during the ultimately unsuccessful litigation strategy. *Cf. Exxon Corp. v. Jarvis Christian College*, No. TY–80–432–CA, 1991 WL 771247, at *2 (E.D.Tex. Feb.15, 1991) (refusing to penalize the royalty interest owners with an excessive period of potential prejudgment interest accruing during the operator's justifiable litigation strategy despite the royalty owners' knowledge of their potential liability).

Moreover, there is undisputed evidence in the record indicating that Huber's liability was established with certainty in 1995 yet Conoco failed to so notify Huber until July 1998. In its statement of uncontroverted facts, Conoco states that, upon judgment being entered against it in 1995, appeal was taken on five of the six properties at issue. Doc. 31, ¶ 21 (citing *Conoco v. Department of Energy*, 99 F.3d 387, 390–94 (Fed.Cir.1996)). The NECU property, and therefore Huber's liability, was not appealed because "it appeared to Conoco that the DOE had met its burden of proving stripper overcharges with respect to all production from [NECU]...." Doc. 31, ¶ 21. In order to receive prejudgment interest from 1995, equity required Conoco to notify Huber at this point.

Conoco's silence also extended up to and included the time when it was negotiating the global settlement with DOE, long after NECU liability was established. Even after the global settlement was finalized, eight months elapsed before Huber was notified of its obligation on the NECU overcharges, an obligation that had been set three years prior. Considerations of equity and fairness simply do not permit the imposition of prejudgment interest during these times. Had Conoco wished to recoup its funds or, put another way, to prevent Huber's "continued use and enjoy-

ment" of money to which Conoco was rightfully entitled, it could have, at any point after liability on NECU was established, demanded payment. Instead, Conoco made the unilateral decision to continue dealing with DOE. Equity does not allow this court to sanction Conoco's attempt to pass the cost of this decision to Huber.

### b. Conoco's Mitigating Arguments

Conoco makes the facially persuasive argument that until the settlement agreement was reached in 1997, it was unable to determine Huber's (or any other royalty interest owner's) liability. Doc. 41, p. 10. Two key points erode the apparent strength of this statement. First, as discussed in some length above, NECU liability was firmly established in 1995. Furthermore, the 1997 settlement agreement was purposefully drafted in a vague, lump-sum manner such that Huber's liability on the overcharges was no less certain in 1981 than it was in 1997. The settlement agreement with DOE in 1997 had nothing to do with Huber's liability or the amount Huber owed because it was designed "to ensure that the settlement generally, and DOE's release of Conoco specifically, covered all Conoco-operated properties audited by DOE and involved in MDL 378." Doc. 32, Ex. 1, ¶ 14 (Affidavit of Bob Ochs). Liability, once it was established, required Huber to account for the difference between the "stripper price" it received and the regulated price DOE established. Both parties agree this was roughly $60,000. While computation of prejudgment interest may have been an open issue, Doc. 32, Ex. 1, ¶ 15, Conoco has offered no reason why Huber could not have been notified of its underlying liability when it became final in 1995.

In addition, Conoco argues (and Huber agrees) that Huber admittedly had knowledge of the price regulation lawsuits that were ongoing across the nation and that

Huber could have asked Conoco what, if any, potential exposure Huber faced at NECU. Doc. 41, p. 10, n. 2. Though Huber certainly could have asked more questions that may have led to a greater awareness, Conoco, as the holder of such information, was in a far superior position to inform Huber of the potential liability. It is ·unfair to place the burden of asking what, in hindsight, were the "right" questions during the pendency of this litigation. Equity, the court holds, does not permit the imposition of such hindsight upon Huber's conduct. If blame is to be placed upon these parties for this lack of communication, it must rest with greater force upon Conoco, the holder of relevant information and the party seeking compensation.

4. Prejudgment Interest Rate

■ After establishing that Conoco is entitled to an award of prejudgment interest and the dates upon which this award will apply, the lone remaining issue is the applicable rate of interest that should be applied. The parties have submitted well-researched and thoroughly argued positions on this issue. Little analysis is required by the court, however, as the issue has already been determined in this district. See *In re Department of Energy Stripper Well Exemption Litigation*, 821 F.Supp. 1432, 1437 (D.Kan.1993) (applying 28 U.S.C. § 1961, the federal post-judgment interest rate, to a claim for prejudgment interest in an overcharge case). As such, the court finds the rate of prejudgment interest should be computed as set forth in 28 U.S.C. § 1961.[22]

● **CONCLUSION**

For the preceding reasons, Conoco's motion for summary judgment is GRANTED.

---

**22.** The court agrees with Huber that the rate governing prejudgment interest is a matter of discretion. Doc. 43, p. 7 (citing *Kleier Adver., Inc. v. Premier Pontiac, Inc.*, 921 F.2d 1036,

Judgment shall be entered against Huber in the amount of $60,178.37. Furthermore, Huber is required to pay prejudgment interest on this amount from July 30, 1998 up to and including the day judgment on this Memorandum and Order is entered. Prejudgment interest shall be computed at the rate established by 28 U.S.C. § 1961. The parties shall confer and agree upon the amount of prejudgment interest as of June 29, 2001 and notify the clerk, who will then enter judgment pursuant to Fed.R.Civ.P. 58.

A motion for reconsideration of this order is not encouraged. Any such motion shall not exceed 5 double-spaced pages and shall strictly comply with the standards enunciated by this court in *Comeau v. Rupp*, 810 F.Supp. 1172, 1174 (1992). The response to any motion for reconsideration shall not exceed 5 double-spaced pages. No reply shall be filed.

IT IS SO ORDERED.

---

1042 n. 4 (10th Cir.1990)). Application of § 1961 to the current dispute sufficiently takes into consideration the aforementioned equitable concerns.